LA SALLE NATIONAL BANK, as Trustee under Trust Agreement dated October 21, 1968, and known as Trust No. 38711, Plaintiff-Appellee, *v.* CITY OF CHICAGO, Defendant-Appellant.

(No. 55839;

First District—June 16, 1972.

Richard L. Curry, Corporation Counsel, of Chicago, (William R. Quinlan and John S. Elson, Assistants Corporation Counsel, of counsel,) for appellant.

L. Louis Karton, of Chicago, for appellee.

Mr. PRESIDING JUSTICE LORENZ delivered the opinion of the court:

The City of Chicago appeals from an order declaring that the existing zoning ordinance was unreasonable insofar as it operated to prohibit the use of plaintiff's property for an automobile service station. Generally the City contends that the existing zoning classification as applied to the subject property was valid.

Plaintiff bank acquired title to the subject property as trustee. Both at the time of purchase and at the time of trial the property was vacant and unimproved. In spite of the fact that the beneficial owners of the trust property were aware that the existing zoning prohibited the use of the property as a service station, they contemplated such use for the property at the time of purchase. On February 24, 1970, plaintiff executed a lease with the Shell Oil Company. That lease was for a term of 15 years at an annual rental of $22,500. Two five year option periods followed with rental for the first period at $26,000 and the second at $29,500. Real estate taxes were to be paid by the lessee. Approximately one month after the execution of the lease, plans and specifications for the construction of a service station on the subject property were submitted to the City's Building and Zoning Department for routine examination and approval prior to the issuance of a permit. Approval of all departments except the Zoning Department was secured.

Under both the 1923 and 1942 zoning ordinances, use of the property for service station purposes was permitted. Prior to March 25, 1970, the property was zoned B 2—4, Restricted Residential District, a classification which does not permit the use of the property as a gasoline service station.[1] On that date the Committee on Buildings and Zoning of the Chicago City Council recommended that the zoning of the subject property be changed to B 5—4, General Service District, a classification which allows the use of the property as a gasoline service station.[2] On this recommendation such an amendment to the ordinance was passed by the City Council on April 8, 1970, but at its next meeting on April 29, 1970, a motion to reconsider the reclassification of the property was

---

[1] Chicago, Ill., Municipal Code 1970, ch. 194A, par. 8.3—2A (5).

[2] Chicago, Ill., Municipal Code 1970, ch. 194A, par. 8.3—5.

passed. Thus, the change in the zoning of the subject property was re-referred to the Committee on Buildings and Zoning and no action has been taken since, leaving the property zoned B 2—4.

The subject property is approximately 14,300 square feet and is located at the southwest corner of Foster Avenue and Sheridan Road; approximately one-half block from an entrance-exit ramp to Lake Shore Drive. A traffic count taken at the intersection revealed that in a twenty-four hour period approximately 25,790 vehicles flow on Foster Avenue and 11,792 on Sheridan Road.

The area to the south of the subject property is characterized as B 2 with some uses equivalent to B 4 classifications. There are no gas stations to the south for five blocks. Immediately to the south of the subject property are two old six flat buildings; each of which have been reconverted to serve as more than six dwelling units. South of those buildings is a new 40 unit apartment building. Immediately to the west of the subject property is an old twelve flat building and a temporary school which was built on the site of an abandoned gas station. On the east side of Sheridan Road directly across the street from the subject property is a four plus one apartment building which contains 112 units. South of that building is another large apartment building with 104 units. There is a conflict in the evidence as to the character of the first floor of the four plus one. The City's witness testified that the use was 100% residential while plaintiff's witness stated that offices occupied the first floor of that building. Proceeding easterly along Foster Avenue from the four plus one there is a nursing home, a two flat, a six flat and another nursing home.

Generally the area to the north of Foster Avenue is characterized as B 5—4 with night clubs, restaurants and lounges on the first floors and apartments or hotels above. Proceeding on the west side of Sheridan Road north of Foster Avenue there is found a 14 or 15 story apartment building, a four plus one consisting of 40 units and a high rise of approximately the same size as the corner building, a parking lot, and a new 50-60 unit apartment building. On the east side of Sheridan Road there are two motels of 150 and 126 units, each of which has a restaurant and cocktail lounge on the first floor. North of the second motel is found a car and truck rental agency and to the north of that is the Edgewater Beach Hotel property. To the east of the two motels and fronting on the north side of Foster is the eleven acre tract of the Saddle and Cycle Club which has a membership of approximately 250. Generally where land is available north of Foster Avenue, new residential construction is carried out. To the south, however, is the Uptown Conservation Area

where there is no new construction because of the deterioration which has taken place in Uptown over recent years.

The Saddle and Cycle Club was the sole objector to the proposed change in zoning. It based its objection on the increased noise and traffic congestion which the proposed use would bring to the area. A representative of the club testified that the trend of development in the area is residential and cited specific developments to the north and south in support of his statement. This is to be distinguished from the testimony of plaintiff's expert that the trend of use in the area is towards a mixture of residential and business development.

A real estate appraiser opined that based upon the market at the time and the capitalization of the net income from the lease at nine percent the property would be worth $250,000. This appraisal reflected the value of the property if the contemplated use could be obtained. An expert witness testifying on behalf of the City stated that the value of the property was $175,000 whether or not the proposed use was authorized, but that appraisal did not consider the lease. The City's expert also testified that the introduction of a gas station on the subject property would have a depreciating effect upon the residential buildings surrounding the site, especially the property immediately south thereof. Plaintiff's expert witness testified however that the proposed use of the property would not in any way injure the public health, safety or general welfare. He also testified that the use as a gas station was the highest and best use for the land and that the existing zoning diminishes the value of the land. The City's expert testified that he believed that the proper zoning for the subject property was B 2—4 or R—6, both of which permit residential use, but not a gas station.

*Opinion*

■■ Plaintiff contends that the zoning classified which prohibits the use of the property for gas station purposes bears no relation to public health, safety and welfare. This question was raised in *Gore v. City of Carlinville* (1956), 9 Ill.2d 296, 300, 137 N.E.2d 368, 370, where the Court stated, "judicial notice may be taken of the fact that the business of storing and handling gasoline at filling stations within a city is attended with a peculiar degree of danger to life and property [Citations] and that the noxious odors, noise and traffic emanating from the conduct of such a business are incompatible with a residence district." Although some other uses are existing and allowed in the area, there is no doubt but that the district involved in the case at bar can be characterized as a residence district. Thus, the classification bears a substantial relationship to the public health, safety and welfare.

● 2-5   The law to be applied in cases such as this was recently reiterated

in *Midwest Bank and Trust Co. v. City of Chicago* (1971), (Ill.App.2d), 273 N.E.2d 519, 521-522 where we said:

"The rule to be applied in examining the evidence in a zoning case recognizes a presumption in favor of the validity of the legislative enactment, and the party attacking it has the burden of overcoming that presumption by clear and convincing evidence. To meet this burden, the property owner's proof must establish more than the reasonableness of alternative zoning classifications; it must establish that the legislative classification is arbitrary, unreasonable, and without substantial relation to the public health, safety, morals or general welfare. *Chicago & N.W. Ry. Co. v. City of Des Plaines*, 97 Ill.App.2d 201, 206, 240 N.W.2d 280; *Mutz v Village of Villa Park*, 83 Ill.App.2d 1, 10-11, 226 N.E.2d 644; *Tuite v. City of Loves Park*, 82 Ill.App.2d 214, 218, 225 N.E.2d 817. Where, as in the instant case, expert witnesses express conflicting opinions as to the reasonableness of a zoning ordinance in its application to a particular piece of property, the court must, from all of the facts, determine whether there is justification for legitimate differences of opinion. *Fiore v. City of Highland Park*, 76 Ill.App.2d 62, 71, 221 N.E.2d 323. And if the court is persuaded by the evidence that the question involved is fairly debatable and the opinions on both sides are reasonable, the answer is not to be supplied by the court, as it must then defer to the legislative judgment of the municipality. *La Salle National Bank v. City of Chicago*, 6 Ill.2d 22, 31, 126 N.E.2d 643."

■■ Plaintiff contends that in the instant case there is no existing presumption in favor of the validity of the zoning enactment. The basis of this contention is allegedly found in the legislative history of the ordinance and the approval by various departments of the plans and specifications submitted by plaintiff. The changes in the zoning ordinance as applied to this property do not in any manner diminish the effectiveness of the most recent legislative determination. The interpretation which plaintiff urges us to place upon the legislative body's activities could only act to have a chilling effect upon future zoning ordinance reconsiderations by the Council. Moreover, the legislative changes are a response to the changing character of the neighborhood and represent an attempt to stabilize and control where possible. This legislative concern is exemplified by the reconsideration of the amendment thus, leaving the pre-existing B 2—4 zoning in force.

■■ The approval of plaintiff's plans by various departments other than the zoning department is also uncontrolling as those departments are only concerned with a limited aspect of the project. No department can overrule the legislative determination of the City Council. The

recommendation of the Planning Department that the property be zoned B 5—4, is merely advisory to the Council and certainly is not binding.

■■ In reviewing the evidence presented in this case we find that legitimate differences of opinion exist over the reasonableness of the zoning classification as applied to plaintiff's property. These differences are demonstrated by the opinions of the various expert witnesses who testified at the trial of this case. Such being the case, the trial court should have deferred to the legislative judgment of the municipality.

The judgment is reversed.

Judgment reversed.

DRUCKER and ENGLISH, JJ., concur.

