CENTRAL MOTORS CORPORATION, APPELLANT, *v.*
CITY OF PEPPER PIKE ET AL., APPELLEES.*

[Cite as Central Motors Corp. v. Pepper Pike (1979),
63 Ohio App. 2d   34.]

* Reporter's Note: A motion to certify the record was overruled by the Supreme Court of Ohio, May 25, 1979.

36

(No. 37605—Decided February 16, 1979.)

*Messrs. Thompson, Hine & Flory, Mr. William D. Ginn* and *Mr. David L. Parham,* for appellant.

*Messrs. Calfee, Halter & Griswold, Mr. Richard Cusick, Mr. Frederick W. Assini, Messrs. Walter, Haverfield, Buescher & Chockley* and *Mr. Robert L. Musser,* for appellees.

KRENZLER, P. J. On January 28, 1974, plaintiff-appellant Central Motors Corp., an Ohio corporation, hereinafter referred to as Central, filed a declaratory judgment action pursuant to R. C. Chapter 2721 for the purpose of establishing the unconstitutionality of certain zoning ordinances of the city of Pepper Pike, and for a declaration of its rights. The defendant-appellees include the city of Pepper Pike, its mayor and council, who shall be collectively referred to as the City.

In its complaint Central alleged that in 1959 it purchased certain real estate located partly in Pepper Pike and partly in the city of Beachwood. Subsequent to Central's purchase, the state of Ohio constructed Interstate 271, a six-lane divided highway, including a Chagrin Boulevard Exit immediately adjacent to Central's property at its southwest corner.

Central alleged that its property is bounded on the west by the interstate; on the north by South Woodland Road; on the east by Brainard Road; and on the south by the boundary line between Pepper Pike and the village of Woodmere. Further, it was alleged that since the inception and construction of Interstate 271, the area immediately adjacent to Central's property along its southern border in the village of Woodmere and the neighboring areas in Orange Village and the city of Beachwood have been subjected to congested and intensive retail, commercial, apartment and shopping center development, which includes such diverse uses as automobile sales agencies, multi-story motels, gasoline service stations, theaters, party centers, restaurants, bars, strip shopping centers, office buildings and apartments.

It was also asserted that prior to the construction of Interstate 271, and the attendant commercial development in the Chagrin exit area, Central's property and substantially all of the property in Pepper Pike was zoned for single family dwellings and minimum one acre lots.

Central also contended that it recognized the changing character of the adjacent and neighboring uses and the

adverse effect of the interstate highway upon one acre single family residential use, and in 1966 it commenced a process of planning, study and analysis of how its property might feasibly and practically be developed so as to take into account the circumstances unique to its property and still enable reasonable use for essentially residential purposes. Central employed planners and architects and requested a zoning change to allow a planned unit development. This request was presented to the council of Pepper Pike and was unanimously rejected.

Central further alleged that Pepper Pike's minimum one acre lot for single family dwelling use is unreasonable and confiscatory when applied to its property which is unique and severable in character from the remainder of Pepper Pike.

Central also alleged that enforcement of the one acre single family zoning on its property would result in great economic hardship and render the land unuseable for its highest and best use; that the zoning is unreasonable, discriminatory and confiscatory; that it bears no real and substantial relationship to the promotion of community needs or the protection of the public health, safety, morals or general welfare; and that it is motivated solely by a private desire to maintain exclusive and exclusionary neighborhoods deemed esthetically pleasing to their historical occupants.

Central further alleged that Pepper Pike does not have a comprehensive zoning plan; does not make provision for diverse community development; and fails to provide for any type of residential development other than single family dwellings on one acre lots. Central's final allegation was that Pepper Pike is acting in an unconstitutional, illegal, arbitrary, capricious and unreasonable manner, and that Central has been deprived of its property without compensation and without due process of law, in violation of Section I of the Fourteenth Amendment to the United States Constitution, and Section 19, Article I, of the Ohio Constitution.

In conclusion, Central prayed that the court declare the zoning ordinances of the city of Pepper Pike unconstitutional as applied to its property, and therefore void and of no effect. In addition, Central sought a mandatory injunction requiring Pepper Pike officials to issue such permits and other authorizations as necessary or desirable to implement the

planning and development of plaintiff's property as set forth in its application to the city on January 16, 1974.

On November 4, 1975, the city of Pepper Pike filed an answer in the form of a general denial, also setting forth several defenses.

Central's argument that the present single family zoning is unconstitutional is based on many factors. Central concedes that Pepper Pike is a high-grade single family community. However, Central contends that its property which is located in the southwest corner of the community is separate, apart, unique, and different from the rest of the community. Since the purchase of the property in 1959, there has been a substantial change in the character of the neighborhood, most notably the construction of Interstate 271 on Central's west boundary, construction of the interchange of Interstate 271 and Chagrin Boulevard, and the commercial development of Chagrin Boulevard from Green Road to Lander Road. Central contends that its property is not desirable for single family use because of the noise and visual pollution from the highway. Other adverse influences in the immediate area include the Village Square Shopping Center abutting Central's property on the south, and the Executive Apartments abutting Central's property on the southeast. In addition, Central contends that it cannot effectively use its property because the cost of improvements under present zoning would exceed the fair market value of the improved single family lots, thus resulting in economic confiscation.

The case was tried to the court commencing November 8, 1976.

The record in the present case includes a five volume transcript containing 1,139 pages of testimony given by eight witnesses, including seven experts, and 41 exhibits. A large portion of the testimony, much of it cumulative and repetitive, is concerned with the constitutionality of single family zoning of Central's property. However, a substantial portion of the testimony relates to Central's planned unit development (P.U.D.), and whether Central submitted sufficient information to obtain a building permit, whether Central is entitled to such a permit, and whether the city must rezone for a P.U.D. use.

Central presented the following witnesses on its behalf:

Frank H. Porter, owner and principal shareholder of Central; Thomas J. Neff, a civil engineer; John F. Haines, an architect with the firm of Walter Gropius; Ralph P. Killian, a traffic engineer; Robert C. Hill, a planner with the firm of Dalton, Dalton, Little & Newport, architects, engineers and planners; Charles Heuer, an architect with the same firm specializing in noise impact; Roger D. Ritley, a real estate appraiser; and Robert F. Schmitt, an experienced land developer and builder.

Rather than review the testimony of each witness, we will summarize the testimony as follows.

In 1959 Central acquired a substantial amount of land located in the cities of Beachwood and Pepper Pike for $2,750 per acre.[1] At the time of purchase the property was bounded on the west by Richmond Road, on the east by Brainard Road, on the south by Chagrin Boulevard, and on the north by South Woodland Boulevard. When Central purchased the property it was aware of Pepper Pike's single family zoning ordinance and Van Sweringen single family deed restrictions on the property.

In 1962 Interstate 271 was constructed and bisected Central's property in a north-south direction, leaving 117 acres in Pepper Pike. Prior to the construction of I-271 most of the quadrant owned by Central and the surrounding area was undeveloped, vacant land with little or no development in the Chagrin-Brainard area, nor in the Richmond-Chagrin area. At the time Central purchased its property there were no houses located along the east side of Brainard Road. However, at the time of the trial there were three single family homes extending along three-quarters of a mile of frontage on the east side of Brainard Road opposite Central's property. Central intended to construct single family homes on its property when it was purchased.

Since the purchase of the property, the Chagrin Boulevard area has substantially changed in character from its undeveloped state to a commercialized area containing gas stations, a health club, automobile agencies, office buildings, motels, a funeral parlor, shopping centers, apartment buildings and other commercial uses. These uses extend both

---

[1] When I-271 was constructed there were 117 acres remaining in Pepper Pike which are the subject of this action.

east and west from the I-271 interchange at Chagrin Boulevard.

The Village Square Shopping Center located in Woodmere Village now abuts Central's property on the south and was constructed in 1962. The Executive Apartments and other commercial uses were constructed on the southeast boundary of Central's parcel. Ohio Savings has constructed an office building on the southwest boundary.

While Richmond Road constituted the original west boundary of Central's property, I-271 now forms its western boundary and passes beneath Chagrin Boulevard below grade at the south end of Central's property and gradually rises 60 feet above the property at the north end. The highway is at or above elevation of Central's property along eighty percent of its border and passes over South Woodland at the north end of the property.

To the north and east of Central's property are a number of single family homes on Brainard Road north of South Woodland, on South Woodland between Brainard and Lander, on Shaker Boulevard between Brainard and Lander, and on Bellcourt Road. East of Central's property on the north side of Chagrin Boulevard are the Eaton Square Shopping Center, and Cleveland Racquet Club. Behind these structures and abutting them are single family residences on Kersdale and Brice Roads. Access to Kersdale is from South Woodland, and access to Brice is from Lander Road.

Central's property is located in the southwest corner of Pepper Pike and abuts I-271, whose center line is the Beachwood border on the west and abuts Village Square Shopping Center with the Woodmere Village line on the south. The entrance to Pepper Pike or its main corridor entering from the southwest is by way of Chagrin Boulevard and Brainard Road past Central's property.

The foregoing explains the condition of Central's property at the time it was purchased and changes that took place since its acquisition, and the present condition of the immediate and surrounding areas.

The zoning of all interchanges of I-271 from Summit County north is for multi-family, commercial or industrial use. However, the height of the tallest buildings is between five and six stories. Between interchanges there are single

family residences abutting I-271 in Oakwood Village, Bedford Heights, Warrensville Heights, Beachwood and Mayfield Heights. No testimony was introduced as to whether these single family homes were constructed before or after the freeway was built. Central's property was originally planned for single family use before the construction of I-271, but due to the noise and visual pollution from the highway and the various abutting commercial uses and the change in character of the neighborhood, Central engaged the services of various planners to design a plan for the highest and best use of the land. At this time Central was aware of Pepper Pike's three story height limitation. Central's planners proposed the planned unit development which was designed essentially as follows: of the 117 acres, 79 acres were to be used for residential purposes at a density of between 5.6 and 6.5 units per acre, or a total of 520 units. Thirty-eight acres were to be used for a shopping center, an office building, and a parking garage. The following is the detail of the planned unit development.

(1) The east side of the property fronting on Brainard Road contains trees and is landscaped to an average depth of 200 feet;

(2) In the center of the northern ⅔ of the property are 140 single family townhouses, one to four stories high, clustered around seven courtyards;

(3) On the west side of the property abutting the freeway are 11 five-story apartment buildings with four apartments on each floor, for a total of 220 units;

(4) On the west end of the property, abutting the freeway and south and west of the five-story apartment buildings, are two 20-story apartments with 80 units each, or a total of 160 units;

(5) On the southwest corner along the freeway and abutting Village Square Shopping Center is a 12-story office building containing 200,000 square feet;

(6) On the southeast corner is a 120,000 square foot two-story shopping center, which abuts Village Square Shopping Center to the south.

Central contends that the office building, shopping center and apartments located south of its property in Woodmere have an adverse effect on its property and would

make it impossible to develop for single family use. On the other hand, Central contends that its enclosed shopping mall together with high-rise apartments and high-rise office buildings on the south side of the property would not have an adverse effect on the balance of its property, nor on the balance of Pepper Pike because of their superior design and construction. The value of the P.U.D. which is expected to be developed over a six to eight year period would be between $60,000,000 and $64,000,000.

There was much testimony at the trial that I-271 creates noise and visual pollution; that the high noise level on I-271 would have an adverse effect on single family residences, especially of the quality required for Pepper Pike; and that commercial developments on Chagrin Boulevard have an adverse effect and a strong negative impact on Central's property and on Pepper Pike.

Testimony was introduced that Central's property is considered an island at the southwest corner of Pepper Pike; that it is a unique parcel of land different from the rest of Pepper Pike; and that it is not consistent with the balance of Pepper Pike because of its location and the adverse surrounding influences of I-271 and the commercial property on Chagrin Boulevard. The Pepper Pike home buyer is more discerning than the average home buyer and would be negatively influenced by these adverse effects.

It was testified that because of all the negative and adverse influences surrounding Central's property it became necessary to design a P.U.D. which would become a buffer between the adverse influences and the balance of Pepper Pike; that the P.U.D. would screen the rest of Pepper Pike from the noise and visual pollution of I-271; that it would provide some open space; that if its property were developed for all single family use there would not be open space; that Pepper Pike would realize a significant net increase in tax revenues from the P.U.D. compared with single family residential development; that the taxes from single family development would be between $203,000 to $235,000. Taxes to be realized from a planned unit development would be between $1,500,000 and $1,623,000 per year; that there would be no adverse visual or economic impact upon the community; that planned unit development is a reasonable use; that

P.U.D. would be very beneficial and not detrimental; that sound is controlled better with mid-rise and low-rise buildings than with single family; that the P.U.D. steps down from the commercial and higher density uses near Chagrin Boulevard to the lower density residential units to South Woodland; that P.U.D. is based on health, safety, morals and welfare.

Central introduced testimony that its land has no value for single family use, and that if developed for single family use it would result in a net loss. The actual hard costs for off-site and on-site improvements would total $2,371,740, of which $1,204,100, would be on-site improvements and $1,167,640, would be off-site improvements. The off-site improvement costs would be for construction of a sanitary sewer from Central's property to the Creekside Sanitary Sewage Treatment Plant. There was testimony that sanitary sewers would not be available to service Central's property for 10 to 11 years, and that even if Central were to wait the 10 to 11 years, the added carrying charges would still make development of single family use economically unfeasible because the added carrying charges for the 10 to 11 years would more than offset the cost of the off-site improvements.

Central had prepared plans for several single family sub-divisions of between 76 and 87 lots. The improvement cost per lot ranged between $26,500 to $42,000 depending on which of the plans were used, making a total improvement cost of $2,371,740, with a retail fair market value of 1.4 million dollars. The total improvement costs do not include land costs or other soft costs, such as interest, marketing, brokers and other charges. This would result in a substantial net loss. There was testimony that septic tanks could be used in lieu of sanitary sewers, but this would limit development to a maximum of ten residential lots.

As to traffic, it was testified that if Central's parcel were developed for its proposed P.U.D., it would be necessary to widen Brainard Road at Central's expense to accommodate the increased traffic. It would be necessary to synchronize certain traffic signals and to divide the existing width of Chagrin Boulevard into three 12-foot lanes by striping rather than have only the center lane striping. The increased traffic generated by the P.U.D. would only affect the major connector streets and would not affect Pepper Pike's residential

streets. It was testified that no traffic changes would be needed if the land were developed for single family residential use.

Noise meter readings taken at the site revealed that noise levels increased along the freeway and to the north where the freeway is above grade. Noise decreases as one moves eastward away from the freeway and then increases again due to the noise from Brainard Road. Single family low density residents are less tolerant of higher noise levels than residents of high density multi-family dwellings.

It was testified that while there was not sufficient material submitted to issue a building permit, there was sufficient material to enact a P.U.D. ordinance.

Testimony was introduced that it was not reasonable to build single family homes behind Village Square Shopping Center even though there were single family homes behind the racquet club on Brice Road and behind Eaton Square Shopping Center and also behind Landerwood Shopping Center.

It was testified that there were between 500 and 600 single family lots available for development in Pepper Pike on land other than Central's; that there were approximately 50 homes per year built in Pepper Pike. If Central were forced to use its property for single family houses, they would not be developed for a long period of time because of the relative quality of Central's lots compared to other lots in the community.

The retail price of single family lots would have to be between $50,000 and $55,000 if the property were developed for single family use.

In 1962 Pepper Pike enacted a comprehensive zoning ordinance with zones, but did not enact a comprehensive zoning plan independent of the zoning ordinance.

After Central presented its evidence and rested, the city filed a motion to dismiss under Civ. R. 41 (B) (2) which was granted by the trial court. In addition, the trial court filed findings of fact and conclusions of law which are as follows:

*"Findings of Fact*

"1. That the zoning ordinance and restrictions were duly adopted and are in accordance with the deed restrictions contained in the Van Sweringen conveyances.

"2. That Plaintiff could develop his land more densely and hence more profitably under his proposed Planned Unit Development.

"3. That Plaintiff's property could be developed under present zoning ordinances, but not as profitably.

"4. That Plaintiff acquired the land with full knowledge of zoning and deed restrictions.

"5. The validity of the zoning ordinance is fairly debatable.

*"Conclusions of Law*

"1. Plaintiff has the burden of proof by clear and convincing evidence.

"2. He must show by the proper quantum of proof that the zoning regulation is unreasonable, arbitrary or capricious and without any relation to the public welfare, health, safety and morals of the residents of Pepper Pike.

"3. Plaintiff has failed to meet his burden of proof.

"4. The wisdom of zoning ordinance and its relation to public health, safety, welfare and morals is left in the first instance to the legislative discretion and authority of the body which creates it and the Court will not substitute its judicial judgment for such legislative judgment where the validity of the zoning ordinance is fairly debatable.

"5. That the fact that the land could be more profitably developed under different zoning regulations is not sufficient in and of itself to invalidate the present zoning ordinances."

Central has taken an appeal from the trial court's order of dismissal and has the following assignments of error:

"I. *Assignments of Errors*

"1. The trial court erred when, presented with a *prima facie* case of an unconstitutional zoning ordinance, it granted a final judgment for defendants based on a motion to dismiss made at the close of plaintiff's case.

"2. The trial court erred by supporting its improper dismissal with Findings of Fact that are directly contrary to the overwhelming and uncontroverted evidence before the court. Specifically:

"(a) The second finding of Fact '[t]hat Plaintiff could develop [sic] his [sic] land more densely and hence more profitably under his proposed Planned Unit Development' and

the third Finding of Fact '[t]hat Plaintiff's property could be developed under present zoning ordinances, but not as profitably' are directly contrary to unrefuted testimony of expert witnesses that the property cannot be developed at all as currently zoned.

"(b) The fifth Finding of Fact that '[t]he validity of the zoning ordinance is fairly debatable' is not only contrary to all the evidence, but is legally irrelevant as well.

"3. The trial court erred in its first and third Conclusions of Law by holding that plaintiff had a burden of proof by 'clear and convincing evidence' and by stating that 'plaintiff has failed to meet his [sic] burden of proof.' "

There are several issues in the present case, and they are as follows:

I. Quantum of evidence required to withstand a motion to dismiss under Civ. R. 41 (B) (2).

II. Degree of proof required before a zoning ordinance will be declared unconstitutional.

III. Framing the issue in a declaratory judgment action attacking constitutionality of a zoning ordinance.

IV. Implementation of an attack on constitutionality of a zoning ordinance in a declaratory judgment action.

V. Reasonable use - P.U.D. or Euclidean Zoning?

VI. Effect of the lack of a comprehensive zoning plan on constitutionality of a zoning ordinance.

VII. Effect of deed restrictions and zoning at the time the property is purchased on the validity of a zoning ordinance.

VIII. Effect of highest and best use, diminution of value, and actual economic loss on constitutionality of a zoning ordinance.

IX. Conclusions.

I

*Quantum of Evidence Required to*
*Withstand a Motion to Dismiss Under Civ. R. 41 (B) (2)*

The trial court dismissed Central's complaint after Central presented its evidence and rested. The first assignment of error deals with the quantum of evidence required to withstand a motion to dismiss filed under Civ. R. 41 (B) (2) in a civil case tried to the court.

First we will discuss when a case tried to the court without a jury may be dismissed under Civ. R. 41 (B) (2) following presentation of plaintiff's evidence. It is noted that different tests apply to dismissals at this point in the proceedings, depending upon whether the case is tried before the court or a jury.

When a case is tried before a jury and a motion for directed verdict is made at the close of the plaintiff's case, the court must construe the evidence most strongly in favor of the party against whom the motion is directed. If it finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted, and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to the issue. Civ. R. 50 (A). Naturally, if reasonable minds can come to more than one conclusion, the motion for a directed verdict should not be granted. The obvious reason for this rule is that if reasonable minds can come to different conclusions, a jury question is presented and the motion should not be granted.

On the other hand, if the case is tried to a court and not to a jury, after the plaintiff has completed the presentation of his evidence and rested, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court then, as trier of the facts, may determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. Civ. R. 41 (B) (2).

Since the judge in a non-jury trial is the trier of fact, he may proceed to weigh the evidence at the close of the plaintiff's evidence even though a question of fact has been presented. He is not required, as he would be in a jury trial, to construe the evidence most strongly in favor of the plaintiff. *Jacobs* v. *Board of County Commissioners* (1971), 27 Ohio App. 2d 63. *Compare* Civ. R. 41 (B) (2) with Civ. R. 50. *See Hoffman* v. *City of Stillwater* (Okla. 1969), 461 P. 2d 944. This is the current rule in the federal courts under Fed. R. Civ. P. 41 (b), which is identical in form to this portion of the Ohio rule. 5 Moore's Federal Practice, Paragraph 41.13 [4], at 41-193 to 194 (1977). This is also the practice in the majori-

ty of states which have adopted rules identical to or closely patterned upon the federal rule. Annotation, 55 A.L.R. 3d 278 (1974). Thus the issue presented by a motion to dismiss under Civ. R. 41 (B) (2) is not whether the plaintiff has presented enough evidence to raise a factual issue for the trier of fact, but rather whether he has shown a right to relief by the requisite degree of proof. *See Jacobs* v. *Board of County Commissioners, supra.*

The purpose of this rule is one of judicial economy. It would be a useless expense for the court to require the defendant to proceed with its case if the trial judge, who is the ultimate fact finder in a non-jury case, decided at the close of the plaintiff's case that the plaintiff had failed to satisfy its burden. There is no presumption that later in the trial the defendant will offer more substantial evidence in the plaintiff's favor than the plaintiff has offered.

Accordingly, where the trial court determines in a case tried without a jury that the plaintiff has not demonstrated his right to relief by the requisite degree of proof, a motion to dismiss at the close of plaintiff's evidence may properly be granted pursuant to Civ. R. 41 (B) (2).[2]

## II

### Degree Of Proof Required Before A
### Zoning Ordinance Will Be Declared Unconstitutional

We shall next address the issues raised by the third assignment of error, finding of fact No. 5, and conclusions of law Nos. 1, 2, 3 and 4, concerning the degree of proof required in order to declare a zoning ordinance unconstitutional. The trial court found the validity of the zoning ordinance was fairly debatable, but concluded that plaintiff had the burden of proof by clear and convincing evidence.

In general, courts apply three basic rules regarding the quantum of evidence required in order for a plaintiff to meet its burden of proof. In civil cases, the burden of proof is generally carried by a "preponderance of the evidence,"

---

[2] It is noted that the cases cited by the appellant which purportedly hold that a motion to dismiss at the close of plaintiff's evidence should not be granted where a question of fact is present were all decided prior to adoption of the Ohio Rules of Civil Procedure on July 1, 1970. *See Euclid Arcade Building Co.* v. *H. A. Stahl Co.* (1918), 99 Ohio St. 47; *Gest* v. *Piketon Lanes* (1965), 5 Ohio App. 2d 1; *Manchester* v. *Cleveland Trust Co.* (1953), 95 Ohio App. 201.

which is defined as the greater weight of evidence. A more stringent standard, usually expressed by the term "clear and convincing" is required to establish an allegation of fraud, a mutual mistake sufficient to justify reformation of an instrument, the existence of a lost will, and similar issues. Finally, in criminal cases, the prosecution must prove its case "beyond a reasonable doubt."

The degree of proof required to overcome the presumption of validity of a zoning ordinance varies from state to state, ranging from a "preponderance of the evidence" to "beyond a reasonable doubt," and including several unconventional court-fashioned rules as to burden of proof.[3]

Ohio, however, has adopted the "fairly debatable" test. One of the earliest statements with regard to burden of proof appeared in *Village of Euclid* v. *Ambler Realty Co.* (1926), 272 U. S. 365, which held that if the validity of the legislative classification for zoning purposes is fairly debatable, the legislative judgment must be allowed to control. In addition, the court stated that, before a zoning ordinance can be declared unconstitutional, its provisions must be clearly arbitrary, unreasonable, and bear no substantial relationship to the public health, safety, morals or general welfare. *Id.*, at 395. Since that time, Ohio courts have utilized the fairly debatable standard in deciding challenges to the validity of zoning ordinances. *Mobil Oil Corp.* v. *Rocky River* (1974), 38 Ohio St. 2d 23; *Willott* v. *Beachwood* (1964), 175 Ohio St. 557; *State, ex rel. Beerman,* v. *Kettering* (1963), 120 Ohio App. 309; *State, ex rel. Prentke,* v. *Village of Brook Park* (1958), 107 Ohio App. 325; *Cleveland Trust* v. *Village of Brooklyn* (1952), 92 Ohio App. 351. Thus, in Ohio, if the validity of the

---

[3] (a) *Lindsey* v. *Camden* (1965), 239 Ark. 736, required proof by a *préponderance of the evidence.*

(b) *Clear and convincing evidence* was the test applied in *Exchange National Bank* v. *Chicago* (1963), 28 Ill. 2d 341; *Jackson* v. *County of DuPage* (1973), 10 Ill. App. 3d 497; *Davidow* v. *Board of Adjustment* (1973), 123 N.J. Super. 162.

(c) *Clear and affirmative evidence* was the test in *Piper* v. *Meredith* (1970), 109 N.H. 328; *LaSalle Nat. Bank* v. *Western Springs* (1974), 22 Ill. App. 3d 533.

(d) *Evidence sufficient to take the matter of reasonableness beyond the reach of fair debate* was required in *Clearwater* v. *College Properties, Inc.* (Fla. App. 1970), 239 So. 2d 515; *LaSalle Nat. Bank* v. *Chicago* (1972), 6 Ill. App. 3d 306; *Montgomery County Council* v. *Scrimgeour* (1956), 211 Md. 306.

(e) *Proof beyond a reasonable doubt* was the standard applied in *Famularo* v. *Bd. of County Commissioners* (1973), 180 Colo. 333.

legislative classification for zoning purposes is fairly debatable, the legislative judgment must be allowed to control. Stated conversely, the invalidity of zoning legislation must be plain, apparent and beyond fair debate before an Ohio court is justified in declaring it unconstitutional. *State, ex rel. Beerman,* v. *Kettering, supra.*

The validity of a zoning ordinance is fairly debatable if reasonable minds may differ. A mere difference of opinion is not sufficient to make the issue of validity of a zoning ordinance fairly debatable because it is relatively easy for a property owner and a municipality to obtain the services of expert witnesses who will have differing opinions as to the validity of a zoning ordinance. The fairly debatable rule must concern itself not with mere words or expressions of opinion, but basic physical facts pertinent to the issue of the validity of the zoning ordinance.

Where it appears from *all the facts* that room exists for a difference of opinion concerning the reasonableness of a zoning classification, the legislative judgment is conclusive. Within reasonably debatable areas of judgment and policies, courts will not attempt to decide what ought to be done or not done by local zoning authorities. Only where illegality is clearly demonstrated or where the ordinance is arbitrary, unreasonable or discriminatory is judicial interference warranted.

Therefore, the courts must in an objective manner scrupulously review the underlying relevant and material evidence and facts in the case as well as the evidence upon which expert opinions are based before making a determination of the validity or invalidity of a zoning ordinance. Courts should resist the tendency to make a determination in regard to the validity of a zoning ordinance based on the mere conclusion or opinion of experts. If two experts have differing opinions, the court should not automatically rule that the issue of the validity of a zoning ordinance is fairly debatable without ever reviewing the underlying evidence. For a mere difference of opinion or a conflict in testimony does not require a finding that the reasonableness of a zoning ordinance is fairly debatable.

It is noted that, while Ohio has adopted the "fairly debatable" test, Ohio cases also contain language to the ef-

fect that the zoning ordinance, in order to be declared unconstitutional, must be demonstrated to be "clearly erroneous," *Curtiss* v. *City of Cleveland* (1959), 170 Ohio St. 127; that the complainant must "clearly establish" that the ordinances are unreasonable and arbitrary, *Alsenas* v. *Brecksville* (1972), 29 Ohio App. 2d 255; or that it must "clearly appear" that the ordinance has no substantial relation to the public health, safety, morals or general welfare. *State, ex rel. Cook,* v. *Turgeon* (1947), 84 Ohio App. 287. In addition, two Ohio appellate courts have applied the strict standard of "clear and convincing evidence." *Stocker* v. *Wood* (1969), 18 Ohio App. 2d 34, 36; *Criterion Service, Inc.,* v. *City of East Cleveland* (1949), 55 Ohio Law Abs. 90.

It is our conclusion that in Ohio the matter of the validity of the ordinance must clearly be taken beyond the reach of fair debate before a zoning ordinance will be declared unconstitutional. Therefore, in order for the plaintiff to withstand a motion for dismissal under Civ. R. 41 (B) (2), it must have clearly removed the issue of constitutionality beyond fair debate.

### III
### *Framing the Issue in a Declaratory Judgment Action Attacking Constitutionality of a Zoning Ordinance*

In order to determine whether the trial court properly granted City's motion to dismiss after Central presented its evidence and rested, it is necessary to first discuss the appropriate method of framing the issues and relief sought in a declaratory judgment action attacking constitutionality of a zoning ordinance.

First, it should be noted that, in litigation involving attacks on the constitutionality of a zoning ordinance, courts have been concerned with the problems of unzoned property and multiplicity of lawsuits. It is for this reason that a declaration of unconstitutionality of a zoning ordinance in a declaratory judgment action should be accompanied by a determination of reasonable use or uses for the property in issue. *Flair Corp.* v. *Brecksville* (1976), 49 Ohio App. 2d 77, at 83, 85. This presumes a prayer for a determination of reasonable use.

While the issue of constitutionality of the single family

zoning of Central's property is central to both parties' positions, different statements of the issue have been enunciated by the parties. The City, in effect, contends that, whether constitutionality of a zoning ordinance is attacked via an appeal under R. C. Chapter 2506 or in a declaratory judgment action under R. C. Chapter 2721, the issue to be determined is whether the prohibition against a proposed use is constitutional. The City relies on *State, ex rel. Sibarco,* v. *City of Berea* (1966), 7 Ohio St. 2d 85; *Mobil Oil Corp.* v. *Rocky River* (1974), 38 Ohio St. 2d 23; and *Superior Uptown* v. *Cleveland* (1974), 39 Ohio St. 2d 36, for this proposition. Central, on the other hand, contends that the issue for determination is the constitutionality of the single family zoning ordinance as applied to its parcel of property. *Flair Corp.* v. *Brecksville, supra.*

In order to resolve this question, it is necessary to review recent zoning litigation.

In *Driscoll* v. *Austintown Associates* (1975), 42 Ohio St. 2d 263, the Ohio Supreme Court set forth the proper methods of challenging constitutionality of zoning ordinances. First, the court eliminated any doubt that may have existed that a declaratory judgment action could be used to attack constitutionality of a zoning ordinance. It validated the action as a method for challenging constitutionality of zoning ordinances. It permitted an alternative to appeal under R. C. Chapter 2506.

The court indicated that, in the past, an R. C. Chapter 2506 action appeared to have been the exclusive method of challenging zoning restrictions, but that in light of Civil Rule 57, which provides in part that "the existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate," the declaratory judgment is now available as an alternative remedy for such challenges.

Secondly, the court noted that, while both actions seek the same ultimate relief, to-wit: elimination of an existing zoning regulation which prohibits a proposed use of the property, the similarities between the two legal procedures end there. The action under R. C. Chapter 2506 is a judicial review of a final administrative decision denying the property owner a variance, while the declaratory judgment action at-

tacking the constitutionality of a zoning restriction does not call into question the denial of a variance and is independent from the administrative proceedings.

As a reflection of the uncertainty in the law prior to *Driscoll* v. *Austintown Associates, supra,* it is noted that the property owners in each of the three cases relied upon by the City attempted to attack constitutionality by a different method; *State, ex rel. Sibarco,* v. *Berea, supra,* by mandamus; *Mobil Oil Corp.* v. *Rocky River, supra,* by an appeal under R. C. Chapter 2506; and *Superior Uptown* v. *Cleveland, supra,* by a declaratory judgment action under R. C. Chapter 2721.

In *State, ex rel. Sibarco,* v. *Berea, supra,* and *Mobil Oil Corp.* v. *Rocky River, supra,* the property in question was zoned for single family use and the property owner petitioned its respective city council for rezoning to permit the operation of a gasoline service station. The request for rezoning was denied. Here, it is appropriate to note the distinction between a request for a change in use, which requires legislative action, and a request for a variance which entails administrative action. Change of use cannot be accomplished by administrative action. *Standard Oil Co.* v. *Warrensville Hts.* (1976), 48 Ohio App. 2d 1. Further, it is emphasized that the property owner could not have taken an appeal under R. C. Chapter 2506 from the refusal of city council to rezone, because R. C. Chapter 2506 is unavailable for review of a legislative matter, such as rezoning of a parcel of land. *Tuber* v. *Perkins* (1966), 6 Ohio St. 2d 155.

Rather than proceeding with a declaratory judgment action attacking the constitutionality of the single family zoning as applied to its property after city council's denial of the rezoning request, the plaintiffs in *Mobil Oil* and *Sibarco* formally applied for, and were properly denied, building permits by the building commissioner who had no authority to grant the permits. Appeals were taken to the Board of Zoning Appeals which affirmed the commissioner's denial. At this point, the facts of the two cases diverge. In *Sibarco,* the property owner instituted an action in *mandamus* against the city of Berea and the building commissioner seeking an order commanding the issuance of the building permits. The writ of *mandamus* was denied on the basis that R. C. Chapter 2506

provided a plain and adequate remedy at law to appeal from the building commissioner's refusal to issue the building permit, reaffirming the general principle that a writ of *mandamus* must not issue where there is a plain and adequate remedy in the ordinary course of law. The court further stated that, because R. C. Chapter 2506 provided a plain and adequate remedy at law, it could be used *"notwithstanding that the zoning ordinance prohibited the use sought."* (*Sibarco, supra*, at 90; emphasis added.) *Also see State, ex rel. Lieux,*v. *Village of Westlake* (1951), 154 Ohio St. 412. It is noted no reference was made to availability of a declaratory judgment action.

In *Mobil Oil Corp.* v. *Rocky River, supra*, the Board of Zoning Appeals refused to entertain the appeal from the building commissioner's refusal to issue the permit on the basis that it lacked authority to grant variances with regard to "use." The property owner then took an R. C. Chapter 2506 appeal which was held to be proper by the Ohio Supreme Court. The court formulated the issue in this R. C. Chapter 2506 appeal as follows:

"Whether the Rocky River zoning ordinance, insofar as it prohibits appellee from constructing a gasoline service station on the subject parcel, has any reasonable relationship to the legitimate exercise of police power by the municipality." (*Mobil, supra*, at 29.)

There is a clear distinction between declaratory judgment actions under R. C. Chapter 2721 and R. C. Chapter 2506 appeals. As indicated above, where a property owner seeks a variance from the strict letter of a zoning regulation, or seeks a building permit for a specific permitted use, it is administrative rather than legislative action which is requested. If the building permit or a variance is denied at the administrative level, an appeal may be taken to the Common Pleas Court under R. C. Chapter 2506. Because application is made with regard to a specific use, and a direct appeal is taken from the denial of the application, the appeal under R. C. Chapter 2506 may challenge only the prohibition against a specific proposed use. The trial court is not required to make an objective determination as to the overall constitutionality of the present zoning, and will view the constitutional issue only in light of the proposed use.

A declaratory judgment action is an independent action at law created by statute and may be brought despite the fact that an alternative remedy is available to a party. *Schaefer* v. *First National Bank of Findlay* (1938), 134 Ohio St. 511; Civ. R. 57. However, a declaratory judgment action may not be maintained until available administrative remedies have been exhausted. *Driscoll* v. *Austintown Associates, supra,* at 267. The affirmative defense of failure to exhaust administrative remedies may be interposed as a defense to an original action to review an order of an administrative body, but must be timely asserted or may be considered waived. *Id.*

Pursuant to R. C. Chapter 2721, entitled Declaratory Judgments, a court of record may declare rights, status, and other legal relations whether or not further relief is or could be claimed. The declaration may be either affirmative or negative in form and effect. R. C. 2721.02. In addition, any person whose rights are affected by a municipal ordinance may request a determination on the issue of its validity. R. C. 2721.03.

Because a declaratory judgment action is an action at law, the issues presented therein may be as broad or as narrow as the plaintiff desires. These issues are derived from the allegations of the complaint, the prayer for relief, and the evidence presented. For instance, the landowner in *Superior Uptown* v. *Cleveland, supra,* brought a declaratory judgment action challenging the validity of a local retail zoning ordinance prohibiting the operation of a gasoline service station. Because the pleadings and prayer for relief were framed solely in reference to the prohibited use of a gas station, the Ohio Supreme Court narrowly framed the issue in this declaratory judgment action to conform it to the pleadings. However, the issues to be determined in a declaratory judgment action attacking constitutionality of a zoning ordinance may include an objective determination as to whether the ordinance is unreasonable, arbitrary and confiscatory, not based on the public health, safety, morals and general welfare, and thus whether or not it is unconstitutional. Further, the prayer for relief may include a request for a determination of a reasonable use or uses of the property if the zoning ordinance is declared unconstitutional, as was done in *Flair Corp.* v. *Brecksville, supra,* and for an order to issue the

building permit when application is made in compliance with zoning ordinances and building code. By complying with such a request, the court will have avoided the two problems of unzoned property and multiplicity of lawsuits. In contrast, the R. C. Chapter 2506 remedy eliminates the problem of unzoned property, but does not necessarily eliminate a multiplicity of lawsuits. *Flair Corp.* v. *Brecksville, supra,* at 85.

Based on the narrow framing of the issue in *Mobil Oil Corp.* v. *Rocky River, supra,* Pepper Pike is contending that the issue is to be framed the same in all constitutional attacks on zoning ordinances. This argument is without merit. Because the attack on constitutionality in *Mobil* arose in an appeal pursuant to R. C. Chapter 2506, the court, cognizant of the fact that typical R. C. Chapter 2506 appeals necessarily involve some particular use which has been denied a landowner, decided to frame the issue with reference to the prohibited use. It is now clear that had the property owner in *Mobil* brought a declaratory judgment action after council's denial of the use change, or without having sought legislative relief, the issue could have been framed to challenge the overall constitutionality of the zoning ordinance as applied to its parcel of land.[4] Thus, in a declaratory judgment action, depending upon the pleadings and prayer, the issue may be as narrowly framed as in an R. C. Chapter 2506 appeal; *see Superior Uptown* v. *Cleveland, supra,* or may embrace the overall constitutionality of a zoning ordinance as applied, as in *Flair Corp.* v. *Brecksville, supra.* In *Superior Uptown,* where the Ohio Supreme Court stated that the object of the declaratory judgment action was identical to an R. C. Chapter 2506 action challenging the validity of zoning legislation, the court did not purport to make a general pronouncement on the similarities in the issues raised in declaratory judgment actions and appeals under R. C. Chapter 2506 under all circumstances.

Rather, the court focused on the pleadings and prayer for relief in that particular case, which happened to have been framed as narrowly as in an R. C. Chapter 2506 appeal.

---

[4] The trial court in *Mobil Oil Corp.* v. *Rocky River, supra,* did in fact find the single family zoning ordinance unconstitutional, but determined that the prohibition against the operation of a gasoline station was not so unreasonable as to be determined unconstitutional.

In the instant case, Central requested a declaration of unconstitutionality of Pepper Pike's present single family zoning, a determination that the proposed P.U.D. was a reasonable use, and other relief as the court deemed just and equitable. While Central's prayer for relief was not drafted as explicitly as that in *Flair Corp.* v. *Brecksville, supra,* implicit in Central's prayer is a request for a determination of reasonable use or uses in the event the P.U.D. is not found to be reasonable. Thus, we interpret the issues raised in the instant declaratory judgment action to be akin to those in *Flair.*

Inasmuch as a declaratory judgment action is available as an alternative method to challenge the constitutionality of a zoning ordinance, it should be apparent that its versatility makes it the more practical method of proceeding. As opposed to the necessarily narrow issues in an R. C. 2506 appeal, the issues in a declaratory judgment action may be broadly framed, depending upon the pleadings, prayer for relief, and evidence presented. Further, in an R. C. Chapter 2506 challenge to the constitutionality of a zoning ordinance, the property owner is gambling that his specific proposed use will be considered reasonable. Under R. C. Chapter 2506, constitutionality in the objective sense is never determined, so that once a court determines plaintiff's proposed use to be unreasonable, it need not proceed any further to make a determination as to reasonable use or uses.

Further, in a declaratory judgment action a declaration of unconstitutionality of a zoning ordinance and a determination of a reasonable use or uses has the same legal effect as a successful R. C. Chapter 2506 appeal. When there is a successful attack on constitutionality under R. C. Chapter 2506, the court has determined that the prohibition against the proposed use is unconstitutional. When a court determines unconstitutionality of a zoning ordinance and a reasonable use or uses in a declaratory judgment action, any action taken to prevent or deny development of the property for that reasonable use will be considered an unconstitutional act. Thus, any prohibition against the reasonable use found by the court is unconstitutional.

It is impossible to determine whether the trial court framed the issue in this case as though in an R. C. Chapter 2506

appeal, to simply make a constitutional test of the prohibition against Central's proposed planned unit development, or whether the court considered the issue to be the constitutionality of the present single family zoning, and if unconstitutional, a determination of reasonable use or uses.

We will resolve any doubts by holding that the first issue for decision in this case is whether the single family zoning of Central's property is unconstitutional. If it is determined to be unconstitutional, a second issue is what reasonable uses can be made of Central's property.

We have carefully reviewed the transcript of the testimony and it is our conclusion that the plaintiff could not develop its land profitably for single family use. Also, it is our conclusion that the plaintiff's property is unique as contrasted to the balance of the property in Pepper Pike, being located in the southwest corner of the community and abutting I-271 on the west, and on its southwest, south and southeast abutting various commercial properties, such as a freeway interchange, gasoline stations, motels, shopping centers, apartments, automobile agencies, etc. In addition, the cost of improvements would exceed the fair market value of the property for single family uses. Therefore, because of the uniqueness of the property, the changed circumstances in the surrounding area, and the cost of improvements for single family purposes, Central met its burden of proof and presented sufficient evidence to clearly demonstrate that the issue of the constitutionality of the single family zoning of its property was beyond fair debate, and thus unconstitutional. The trial court erred in granting the City's motion to dismiss. Central was entitled to a determination of unconstitutionality and a determination of reasonable use based on the evidence presented. The commercial shopping center, the two high-rise apartment buildings, and the high-rise office building are not reasonable uses because they have the same adverse effect on the balance of Central's property and on Pepper Pike that Central contends the present commercial uses on Chagrin Boulevard have on its property. On the other hand, the 200 foot landscaped area along Brainard Road, the medium-rise, low density five-story apartment buildings on the west side of the property abutting the freeway, and the low density, low-rise townhouses and apartment uses with a

density of 5.6-6.5 units per acre are reasonable uses. The detail of the zoning regulations for the reasonable use or uses is left to the discretion of the City as will hereinafter be discussed.

It is noted that this determination is made based on the testimony presented by Central in its case in chief. Since the case was dismissed after Central rested, the City has not yet had an opportunity to present evidence in support of the constitutionality of the single family zoning or testimony in regard to alternative reasonable uses in the event that the single family zoning is ultimately determined unconstitutional.

## IV

### *Implementation of a Successful Attack on Constitutionality of a Zoning Ordinance in a Declaratory Judgment Action*

Another area of disagreement between Central and the City concerns the implementation of the court's decree.

In its complaint Central prays for a determination of the unconstitutionality of single family zoning of its property, an order that a building permit be issued for its proposed P.U.D., and other equitable relief.

The City contends that it cannot issue a building permit for P.U.D. use because Central has not submitted sufficient material to obtain a building permit, and further, that the City does not have a P.U.D. ordinance. The City argues that it is always necessary that there be a zoning ordinance with regulations in regard to use, height, area, density, yard set-back, parking and other zoning requirements before a person may apply for a building permit. Also, it is argued that enactment of such a zoning ordinance should be left to the discretion of the municipality, and therefore, that courts should not interfere unless a zoning regulation is unreasonable.

If a municipality does have a zoning ordinance for the reasonable use determined by the court, and the court orders that the building permit be issued if and when the successful plaintiff applies for a building permit and presents plans and specifications in conformity with the municipality's zoning ordinance and building code, events normally proceed in an orderly fashion and the building permit is issued. This is a relatively simple procedure.

However, a more complex situation arises where a municipality does not have a zoning ordinance for the reasonable use found by the court. Such a situation pertains to the present case because Central has requested issuance of a building permit for its proposed P.U.D. on property presently zoned for single family use, and the City does not have a P.U.D. ordinance.

Generally, when a court determines unconstitutionality of a zoning ordinance as applied to a particular parcel of property in a declaratory judgment action and finds a reasonable use and the municipality does not have a zoning ordinance for the reasonable use, the decree may be fashioned in general or specific terms. If the decree provides for the reasonable use, this declaration should be sufficient to cause the appropriate governmental agencies to accept their responsibility for implementing the court's order by enacting a reasonable zoning regulation within a reasonable time for the reasonable use. *See Grant* v. *Washington Township* (1963), 1 Ohio App. 2d 84, 89. On the other hand, while courts are reluctant to order property rezoned, the court may order the municipality to rezone the subject property for the reasonable use within a reasonable or stated period of time by adopting reasonable zoning regulations. There is little difference in the practical effect of a general or specific decree because if the municipality does not adopt the reasonable zoning regulation within a reasonable time, the court has authority to enforce its decree pursuant to its general equity power and R. C. 2721.09.

To avoid the confrontation between the courts and a municipality it is presumed and hoped that once the court determines unconstitutionality and a reasonable use, the municipality would immediately enact reasonable zoning regulations for the reasonable use. It would thus maintain both the integrity of the municipal legislative process and the court's order and the balance between the courts and the municipality. If, however, for some reason a municipality refuses to act, or acts in an unreasonable manner, or does not act within a reasonable time, the court has several alternative courses of action.

Generally speaking, courts recognize the separation of powers between executive, legislative and judicial branches

of government and prefer not to interfere with the other branches of government. However, when the executive, legislative or administrative branches are not in compliance with the law, and a case is brought to the court for resolution, the courts are obligated to make a decision and ensure that the decision is enforced.

Thus, the issue is no longer whether the court will enforce its decree, but the manner in which it will enforce it, and the latitude it will give the municipality.

As previously noted, once a zoning ordinance is declared unconstitutional as applied to a property owner's parcel of land, and a court makes a determination as to reasonable use or uses for that land, any action taken to frustrate the property owner in his development of the land for its reasonable use is an unconstitutional act. While there is a separation of powers between the judicial and the legislative and executive branches of the government, once a court becomes involved in a legislative matter such as zoning and a municipality defaults on its obligation to comply with a court order, the court may, pursuant to R. C. 2721.09, and its inherent power, fashion a remedy to assure enforcement of its order. The city should make a prompt start toward full compliance with the court order and the burden rests upon the city to demonstrate that additional time is necessary to comply with the order. Where this burden is not met, the court, having retained jurisdiction of the matter, may take such action as is necessary to repair the denial of a property owner's right to develop his land in a manner consistent with the court order.

The court may implement a remedial plan and appoint planning and zoning consultants and engineers to recommend a zoning ordinance for the reasonable use, may or may not conduct a hearing before it adopts the plan, and may rely on the consultants' expertise and adopt their recommendation. The use of a planning consultant provides a compromise between the immediate ordering by the court of the issuance of a building permit on the one hand, or permitting the recalcitrant municipality to totally frustrate the court's order on the other. By the use of expert consultants the courts avoid entering a field in which they lack the required expertise.

Once the court adopts the expert planners' zoning regula-

tions, the party may apply for a building permit and it will be issued either by the municipality or the court, depending upon the facts and circumstances.

A court can issue a building permit without the advantage of expert planning assistance. But this recourse ought to be used sparingly, and only under extreme circumstances.

Lastly, the court could declare the property unzoned, which would permit the property owner to use its property for any purpose except a nuisance. This remedy, again, should only be used in the most extreme situations.

In the present case the City is correct in its contention that a building permit could not be issued to Central in the absence of a valid ordinance with appropriate zoning regulations. If Central ultimately prevails in this declaratory judgment action, it will be necessary that a zoning ordinance with appropriate regulations be made before a building permit is issued.

## V

### Reasonable Use—P.U.D. or Euclidean Zoning

Central seeks a court-ordered planned unit development if Pepper Pike's present single family zoning ordinance is declared unconstitutional. In other words, Central is arguing that the court must find the proposed planned unit development a reasonable use. We have already decided that there must be a zoning ordinance with detailed regulations before a building permit may be issued, and it is for the municipal legislative body in the first instance to adopt reasonable zoning regulations.

Central argues that its P.U.D. must be adopted and the City contends that it has the discretion of either adopting a zoning ordinance by the Euclidean zoning method or the P.U.D. method, and it is the City and not Central that will make this determination.

It is noted that there are a variety of ways in which zoning legislation may be enacted. The traditional way, as set forth in *Euclid* v. *Ambler Realty Co.* (1926), 272 U. S. 365, is for a municipality to have a cumulative ordinance which rigidly divides all of its territory into separate use classifications such as single family, multi-family, industrial, and commercial. This type of zoning has become known as "Euclidean" zoning. Due to the inherent inflexibility of Euclidean zoning,

other types of zoning devices such as the planned unit development, cluster zoning, and contract zoning, have been developed.

When a court declares a zoning ordinance unconstitutional, it must also determine a reasonable use or uses for the property if the prayer for relief includes such a request. *Flair Corp.* v. *Brecksville, supra.* A reasonable use is one which is in harmony with and consistent with existing zoning and, or, uses surrounding the property in question.

Neither the court nor the municipality is required to approve of the P.U.D. concept merely because the developer urges its adoption.

Further, a proposed use is not always a reasonable use. It is for the court, and not the plaintiff, to determine the reasonable use. The plaintiff has the burden of presenting sufficient evidence regarding the community in general and the specific area in question. To meet its burden in the trial of a case challenging constitutionality of a zoning ordinance, the plaintiff will introduce evidence to prove unconstitutionality of the ordinance and evidence sufficient for the court to determine a reasonable use in the event the present zoning is unconstitutional. In addition, normally a defendant city will attempt to show that the zoning ordinance is constitutional and also present evidence suggesting reasonable alternative uses in the event the ordinance is found to be unconstitutional. It is upon such evidence that the court will determine a reasonable use or uses.

If the municipality already has a zoning category for the court-ordered reasonable use, then the developer must submit to the community building plans and specifications in conformity with the area, height, sideyard, and other regulations for that particular zoning category. Once plans conforming to the specified regulations are submitted, the city must issue a building permit so that development may proceed. If, however, a municipality does not have a zoning category under which the court's order may be implemented, the municipality must first enact the appropriate zoning legislation. This may be done by the enactment of either a planned unit development ordinance authorizing a planned unit development district, or through the more traditional Euclidean zoning. This is a matter for the discretion of the legislative authority of the municipality.

In summary, neither the court nor the municipality is required to accept Central's entire proposal as a reasonable use for the property in question. The court will determine a reasonable use upon evidence of the general character of the community in which the property is located. The municipality in the absence of an appropriate existing zoning category, will, in its discretion, determine the zoning regulations which are necessary to satisfy the court's order.

Thus, Central's contention that the court must accept its proposed P.U.D. as a reasonable use for the subject property is erroneous.

## VI

### Effect of Lack of Comprehensive Zoning Plan on Constitutionality of Zoning Ordinance

It is Central's contention that, because the city of Pepper Pike does not have a comprehensive zoning plan, its zoning ordinances are unconstitutional. This argument is without merit.

Ohio law does not require a municipality to adopt a comprehensive zoning plan as a condition precedent to the enactment of zoning legislation. *See* R. C. 713.06; R. C. 519.02. In fact, although a comprehensive plan is usually separate and distinct from a zoning ordinance, it is possible for an ordinance in and of itself to be a comprehensive plan, absent a specific requirement in the enabling legislation. *Cleaver* v. *Board of Adjustment* (1964), 414 Pa. 367.

Thus, although the existence of a comprehensive plan makes it more difficult to attack the constitutionality of a zoning ordinance, it is still the general rule that the challenge to constitutionality must establish that the ordinance is arbitrary, confiscatory, unreasonable, and not based on the public health, safety, morals and general welfare.

## VII

### Effect of Deed Restrictions and Zoning at the Time Property is Purchased on Validity of Zoning Ordinance

In its findings of fact 1 and 4 the trial court found that the zoning ordinance and restrictions upon Central's land were duly adopted in accordance with deed restrictions contained in the Van Sweringen conveyances. The court also found that Central acquired the land with full knowledge of the zoning

ordinance and deed restrictions. The trial court did not draw any conclusions of law expressly based upon these findings. Since it is not clear what weight, if any, these findings may have had upon the court's dismissal of Central's action, these findings must be placed in proper legal perspective.

It is first noted that the constitutionality of zoning ordinances and the validity of deed restrictions are decided in two separate proceedings. The fact that deed restrictions limit certain property to single family use does not prevent a municipality's legislative body from rezoning that property to a different use. *Willott* v. *City of Beachwood, supra.* Similarly, in passing upon the constitutionality of a zoning ordinance the effectiveness of deed restrictions upon the property is not taken into consideration. *Id.* Thus the presence of deed restrictions has no effect upon zoning. Enforcement of deed restrictions upon property must be pursued by those who have standing, to attack violations of the restrictions. This takes place in a separate proceeding from one such as the case at bar involving the constitutionality of a zoning ordinance. *See Berger* v. *The Van Sweringen Co.* (1966), 6 Ohio St. 2d 100.

Further, the fact that property has deed restrictions and is zoned for a certain use when acquired does not prevent a party from later attacking the deed restrictions as invalid or the zoning ordinance as unconstitutional. As already noted, consideration of the validity of deed restrictions takes place in a separate proceeding from one involving constitutionality of the zoning ordinance. Thus, the fact that Central knew of the deed restrictions at the time of acquiring the property is legally insignificant. In addition, the fact that Central knew that the property was zoned for single family residences when it purchased the property does not have any bearing upon a determination of whether that zoning is unconstitutional in light of the present changed conditions. Accordingly, the court's findings regarding Central's knowledge of zoning and deed restrictions at the time of purchase, as well as its finding regarding the fact that the zoning was consistent with the deed restrictions upon the property, are without legal significance in deciding this case.

## VIII
### *Effect of Highest and Best Use, Diminution of Value and Actual Economic Loss on Constitutionality of a Zoning Ordinance*

Central is in effect contending that it is entitled to develop its land for its highest and best use and that if it cannot develop its land for the highest and best use and there is a resultant diminution of value or economic loss from use of its property for single family purposes, the single family zoning is unconstitutional. In findings of fact 2 and 3, the court in effect found that Central could develop its land profitably under single family zoning and in conclusion of law 5 stated that the fact that the land could be more profitably developed under different zoning regulations is not sufficient in and of itself to invalidate the present zoning ordinance.

It thus becomes necessary to determine the effect of the highest and best use, diminution of value and actual economic loss on constitutionality of a zoning ordinance.

The transcript of testimony reveals that Central did not instruct its planners to use their own discretion to develop a reasonable plan for the use of its land, but instead instructed them to come up with a plan for the highest and best use of the property. It is now contended that since a P.U.D. would be the highest and best use of the land, single family zoning is unconstitutional and that Central should be permitted to proceed to develop its P.U.D. Central further contends that application of single family zoning to its property causes a diminution of the land's value, and also that development of the land in accordance with present zoning would result in an economic loss. Thus it is argued that single family zoning is unconstitutional. It is accordingly necessary to examine the three economic concepts of highest and best use, diminution in value, and economic loss as they relate to constitutionality of a zoning ordinance.

As for the highest and best use, this is a concept considered in appropriation cases. *See Masheter* v. *Kebe* (1976), 49 Ohio St. 2d 148. The standard to be applied in determining the constitutionality of a zoning ordinance is whether the municipality's power to zone has been "exercised in such an arbitrary, confiscatory or unreasonable manner as to be in violation of constitutional guarantees," *Willott* v.

*Beachwood, supra,* and whether the ordinance "bears a real and substantial relation to the public health, safety, morals or general welfare." *Curtiss* v. *Cleveland, supra.* A zoning ordinance will not be declared unconstitutional because the property is not zoned for its highest and best use. Central's claim of unconstitutionality on the basis of highest and best use is not valid.

The concept of diminution in value is closely tied to the concept of highest and best use. Diminution in value occurs where a landowner is unable to make as large a profit from developing his land in accordance with present zoning as he could if he developed the land for its highest and best use. Central is contending that the diminution in value which resulted from its inability to develop its land for its highest and best use is an unconstitutional taking. This is erroneous. It is fundamental that a showing of diminution of land value due to a zoning ordinance, taken alone, is insufficient to invalidate the existing zoning. *Alsenas* v. *City of Brecksville* (1972), 29 Ohio App. 2d 255; *Cleveland Trust Co.* v. *Village of Brooklyn* (1952), 92 Ohio App. 351. *See City of Eastlake* v. *Forest City Enterprises, Inc.* (1976), 426 U. S. 668, 674, note 8; *C. Miller Chevrolet, Inc.,* v. *City of Willoughby Hills* (1974), 38 Ohio St. 2d 298. Nevertheless, proof of economic loss may be considered in determining whether there is a substantial relationship to the public health, safety, and welfare. In each such case, evidence as to the diminution of value of the property must be balanced against the benefit to the public health, safety and welfare derived from existing zoning. *C. Miller Chevrolet, Inc.,* v. *City of Willoughby Hills, supra.* Thus, the economics of each case is a factor to be considered but is not determinative of unconstitutionality. Obviously the more severe the diminution in value, the stronger the public benefit must be in order to uphold the order. *Curtiss* v. *Cleveland, supra.* Thus a mere showing by Central that the application of single family zoning to its property diminishes the value of its land is not enough to warrant a finding that the ordinance is unconstitutional.

The concept of diminution in value may be distinguished from that of economic loss. In the former case the owner is able to develop his land for some reasonable use, although his profits may be lower than would be the case if he were per-

mitted the highest and best use. Where economic loss is involved, on the other hand, productive use of the property may effectively be precluded, since the land may only be developed if the owner incurs an actual out-of-pocket loss for the present zoning. This would occur where the total of the fair market value of the land plus improvement costs, carrying charges, and other reasonable expenses are in excess of the fair market value of the improved land under the present zoning category.

Taken alone, proof of economic loss will not result in a finding that a zoning ordinance is an unconstitutional taking of property and thereby invalidate the ordinance. *Curtiss* v. *City of Cleveland* (1959), 170 Ohio St. 127; *Curtiss* v. *City of Cleveland* (1957), 166 Ohio St. 509. Like diminution of value, proof of economic loss is some evidence and an important factor in determining whether the ordinance is arbitrary, unreasonable and without a real and substantial relationship to the public health, safety, morals and general welfare. *See Curtiss* v. *City of Cleveland* (1959), 170 Ohio St. 127, 131. In each case the court must balance the economic benefits to the property owner which would result from a change in use against the benefits to the public health, safety, morals and welfare from existing zoning. *C. Miller Chevrolet* v. *City of Willoughby Hills, supra.* Thus, while proof of economic loss is an important factor to be considered in determining whether a zoning ordinance is unconstitutional, it does not control.

The trial court's findings of fact 2 and 3 that Central could develop its land profitably under single family zoning is not correct. The record clearly demonstrates that if Central developed its land for single family use it would suffer a substantial economic loss.

While the trial court's conclusion of law 5 is a correct statement of the law generally, it is incorrect as applied to this case because Central cannot develop its property at a profit for single family use, and Central presented sufficient additional evidence by the required degree of proof to demonstrate that the present single family zoning as applied to its property is arbitrary and unreasonable and does not bear a substantial relationship to health, safety, morals or welfare of Pepper Pike.

## IX

### *Conclusion*

The trial court's five findings of fact and five conclusions of law will be summarized and reviewed.

The first finding of fact that the zoning ordinance and restrictions were adopted in accordance with the deed restrictions in the Van Sweringen conveyances is supported by the record, but is an irrelevant finding in regard to the issues presented in this case.

Findings of fact 2 and 3, taken together, in effect state that Central could develop its land profitably for single family use. This is not correct. The record clearly demonstrated that Central could not develop its land profitably for single family use, but it could develop its land more densely and profitably under its P.U.D. proposal.

Finding of fact 4 that Central acquired the land with full knowledge of zoning and deed restrictions is supported by the record, but is irrelevant under the evidence in this case.

Finding of fact 5 that the validity of the zoning ordinance is fairly debatable is not supported by the record. On the contrary, Central introduced sufficient evidence to clearly remove the matter of the validity of the single family use classification of its property beyond the reach of fair debate. In doing so, it demonstrated that it was entitled to relief.

Conclusion of law 1 that the plaintiff has the burden of proof by clear and convincing evidence is in error. The test as to the requisite degree of proof in the state of Ohio is that the plaintiff has the burden of proof by clearly removing the matter of the validity of the zoning classification of which it complains beyond the reach of fair debate.

Conclusion of law 2 that Central must show unconstitutionality of the zoning ordinance by the proper quantum of proof is a correct statement of the law standing alone. However, conclusion of law 3 that Central failed to meet its burden of proof is in error because Central presented sufficient evidence to clearly remove the matter of the validity of the classification of single family zoning of its property beyond the reach of fair debate.

Conclusion of law 4 is a correct statement of the law regarding the degree of proof required to prove unconstitutionality of a zoning ordinance. However, we have held that

the issue of the validity of the present zoning ordinance has been removed beyond the issue of fair debate by the evidence presented by Central. This entitled Central to relief.

Conclusion of law 5 is also a correct statement of the law in that profit or lack of profit standing alone is not sufficient in and of itself to invalidate a zoning ordinance. Zoning ordinances in Ohio will only be declared unconstitutional if they are arbitrary, unreasonable, confiscatory and do not bear a substantial relationship to the public health, safety, morals and general welfare. Proof of profit, or lack of profit, is relevant, but not determinative of constitutionality of a zoning ordinance.

In addition, the issue presented by the pleadings, the prayer for relief, and the evidence in this case is the constitutionality of the single family zoning of Central's property, and if declared unconstitutional, a reasonable use or uses for the property. The City has the authority to enact a zoning ordinance for a court-determined reasonable use, including regulations with regard to height, area, setback, parking, and other zoning requirements.

We have also concluded that lack of a comprehensive zoning plan does not in and of itself require a finding that the single family zoning of Central's property is unconstitutional; that the failure or refusal to zone for the highest and best use of Central's property does not invalidate the present single family zoning of Central's property; and further, the fact that the present zoning results in a diminution in value of Central's property does not make the single family zoning unconstitutional as a matter of law.

In order for a zoning ordinance to be declared unconstitutional it must be considered unreasonable, arbitrary, and confiscatory and not bear a substantial relationship to the public health, safety, morals and general welfare. Actual economic loss or economic confiscation in the present case, together with other factors, would render the single family zoning of Central's property unconstitutional because single family zoning as applied to Central's property is arbitrary, confiscatory, unreasonable and not based on health, safety, morals and welfare.

Based on the foregoing, the trial court erred in dismissing Central's case after it rested because it demonstrated its

right to relief by the requisite degree of proof, to-wit: it clearly removed the matter of the validity of the classification of single family zoning of its property beyond the reach of fair debate. Further, Central's first, second and third assignments of error are all well taken and the case is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment reversed and cause remanded.*

JACKSON and DAY, JJ., concur.