COLUMBIA OLDSMOBILE, INC., APPELLEE, *v.* CITY OF MONTGOMERY, APPELLANT.

[Cite as Columbia Oldsmobile, Inc. *v.* Montgomery (1990), 56 Ohio St. 3d 60.]

(No. 89-1132—Submitted September 25, 1990—Decided December 12, 1990.)

**62**

*Keating, Muething & Klekamp, Joseph Trauth, Jr.* and *Richard Creighton, Jr., Porter, Wright, Morris & Arthur, Ronald W. Gabriel* and *Robert A. Meyer, Jr.,* for appellee.

*Richard B. Dusterberg,* director of law, *Schwartz, Manes & Ruby Co., L.P.A., William B. Singer, Calfee, Halter & Griswold, John Gotherman, Mark I. Wallach* and *Joseph A. Castrodale,* for appellant.

*Thompson, Hine & Flory, Jack F. Fuchs* and *Richard B. Tranter,* urging affirmance for *amicus curiae,* Ohio Home Builders Association.

*Judkins & Hayes* and *Robert J. Judkins,* urging affirmance for *amici curiae,* American Planning Association and Ohio Planning Conference.

*Baker & Hostetler, Michael E. Minister* and *Jane S. Arata,* urging reversal for *amicus curiae,* Ohio Municipal League.

*Per Curiam.* This case presents the question of whether a trial court must uphold a municipal zoning ordinance when there is competent, credible evidence that the ordinance allows the landowners to retain an economically viable use of their land and that the ordinance substantially advances a legitimate governmental interest in the health, safety or welfare of the community. We answer this question in the affirmative. Thus, we must reverse the judgment of the court of appeals and reinstate the decision of the trial court.

"* * * In order to invalidate a zoning regulation on constitutional grounds, the parties attacking it must demonstrate, beyond fair debate, that the zoning classification denies them the economically viable use of their land without substantially advancing a legitimate interest in the health, safety, or welfare of the community. * * *" *Ketchel* v. *Bainbridge Twp.* (1990), 52 Ohio St. 3d 239, 243, 557 N.E. 2d 779, 783, citing *Karches* v. *Cincinnati* (1988), 38 Ohio St. 3d 12, 19, 526 N.E. 2d 1350, 1357. See *Mayfield-Dorsh, Inc.* v. *South Euclid* (1981), 68 Ohio St. 2d 156, 22 O.O. 3d 388, 429 N.E. 2d 159; *Brown* v. *Cleveland* (1981), 66 Ohio St. 2d 93, 20 O.O. 3d 88, 420 N.E. 2d 103; *Superior Uptown, Inc.* v. *Cleveland* (1974), 39 Ohio St. 2d 36, 68 O.O. 2d 21, 313 N.E. 2d 820; see, also, *Penn Central Transp. Co.* v. *New York City* (1978), 438 U.S. 104; *Goldblatt* v. *Hempstead* (1962), 369 U.S. 590; *Euclid* v. *Ambler Realty Co.* (1926), 272 U.S. 365. Thus, we must employ a two-part analysis to pass on the constitutional validity of a zoning ordinance. We will first determine whether the zoning ordinance allowed the landowner, Columbia Oldsmobile, an economically feasible utilization of its 11.5-acre parcel. We must next determine whether the ordinance permissibly advanced a legitimate interest of the city of Montgomery. *Mayfield-Dorsh, Inc., supra.*

**I**

We turn first to our discussion of economic feasibility. Ordinarily, a zoning ordinance is not confiscatory so long as the owner is not deprived of the reasonable use of his property. *Valley Auto Lease of Chagrin Falls, Inc.* v. *Auburn Twp. Bd. of Zoning Appeals* (1988), 38 Ohio St. 3d 184, 527 N.E. 2d 825, syllabus. However, a zoning ordinance that deprives an owner of all uses except those which are highly improbable or practically impossible under the circumstances is impermissibly restrictive. *Id.* at 186, 527 N.E. 2d at 827; *Negin* v. *Mentor Bd. of Bldg. & Zoning Appeals* (1982), 69 Ohio St. 2d 492, 23 O.O. 3d 423, 433 N.E. 2d

165; *Superior Uptown, Inc.* v. *Cleveland, supra.*

Among the trial court's findings of fact and conclusions of law is the specific finding that "[p]laintiff can obtain a fair and reasonable profit if the subject property is developed in accordance with existing zoning." Based upon the evidence, the court went on to note that "* * * [a] viable, marketable and profitable single family residence subdivision can be developed on the rear 11.5 acres of the subject property, consistent with its surrounding land uses. A viable, marketable, and profitable 30,000 square foot retail shopping center can be developed on the [5.1-acre] Retail 'E' frontage of the subject property."

The court of appeals reversed these findings, based upon four factors. First, the court believed that Columbia's 11.5-acre parcel is located within the Montgomery Road commercial corridor, a heavily developed and concentrated business area. Second, the court noted that Columbia's adjoining 5.1-acre parcel is already zoned "E" retail. Third, the court averred that the city in 1982 passed an ordinance to allow the planned development of the property directly north of Columbia's property and in 1985 approved a resolution to allow for the commercial use of the property directly across Montgomery Road from Columbia's 5.1-acre parcel. Fourth, the court acknowledged the previous uses of the site as a drive-in theater and storage site for highway equipment. The court stated that these factors combined to make Columbia's 11.5-acre parcel unsuitable for the residential development required to comply with the parcel's "A" residential zoning classification.

At trial, Jerry Devitt, a professional real estate broker and appraiser and former president and director-treasurer of the Cincinnati Board of Realtors, testified that the 11.5-acre rear parcel is worth $135,000, or approximately $11,700 per acre when undeveloped and zoned as "A" residential. He further stated that the 5.1-acre retail frontage parcel is worth $1,750,000, or approximately $350,000 per acre when undeveloped and zoned "E" retail. Devitt noted that the major portion of the value of commercial properties is found in the frontage. David N. Tipton, a commercial real estate developer, opined that the entire 16.6 acres, if undeveloped and zoned as retail, would be worth $3,154,000, or approximately $190,000 per acre.

However, the majority of the trial court's attention was occupied by testimony concerning the efficacy of profitably developing these two parcels. As Columbia and Montgomery each attempted to address whether it would be feasible to construct a single-family home subdivision on the 11.5-acre parcel, the parties presented conflicting evidence regarding the price that a new single-family home built in such a subdivision might command.

Columbia's witness, West Shell, chairman of a single-family home listing agency, testified that a single-family home built in the new development would command a maximum price of only about $150,000. He based this conclusion in part upon the fact that the most expensive home in Governor's Watch, the adjoining subdivision, sold for $131,000. Shell averred that a $150,000 price per home would reflect a return on investment too low to justify undertaking such an enterprise.

Montgomery's witness, Jerry Devitt, testified regarding new home sales in comparable locations in the Sycamore School District where the subject 11.5-acre parcel is located. The asking price of those homes ranged from just over $200,000 to nearly

$290,000. Additionally, Kenneth R. Campbell, a professional developer of single-family homes, testified that Multiple Listing Service data from the Cincinnati Board of Realtors revealed that the overwhelming majority of new single-family homes with three or more bedrooms in the Sycamore School District listed from $200,000 to $470,000. Columbia's witness, West Shell, acknowledged the general accuracy of these figures and also acknowledged that homes priced at $200,000 through $250,000 would be in the low range of new homes sold in the Sycamore School District.

Campbell and another Montgomery witness, Ronald K. Edgerton, a professional city planner, architect, and consultant, testified regarding a two-phase plan they had developed to place a residential subdivision on the 11.5-acre parcel. The subdivision would consist of eighteen single-family homes on twenty-thousand-square-foot lots and would conform to Montgomery's "A" residential zoning requirements. Campbell stated that each phase of the plan could yield a significant profit.

The first phase or development phase of the plan would consist of subdividing the land into lots, constructing streets and sewers and laying utility lines. Campbell stated that if he could purchase the undeveloped land for the $135,000 price quoted by Jerry Devitt, Campbell's gross profit in selling lots to builders would be $611,100 for the eighteen lots, a profit of approximately sixty-one percent. To receive his minimum twenty-five percent profit, Campbell asserted that he could afford to pay nearly $500,000 for the undeveloped land. He based his testimony that he could market the eighteen lots for an average of $55,000 each upon three sources of information. First, Campbell had developed a subdivision in the middle 1970s on a similarly sized parcel in Montgomery that adjoined offices and condominiums near Montgomery Road. Second, Campbell had consulted home builders with whom he regularly worked in the Sycamore School District. Third, he considered prices paid for similar lots in similar areas.

The second phase or new home construction phase would consist of actually constructing several different models of homes which Campbell, who is also a builder, considered appropriate for this location. Campbell declared that in selling the eighteen new homes in this subdivision, he would expect an average profit per home of approximately $23,000 to $24,000, or approximately $414,000 total profit. Therefore, Campbell posited that given an undeveloped land cost of $135,000, his profit would entail approximately $611,100 for the development phase and approximately $414,000 for the new home construction phase, totalling $1,025,100 profit for fully developing, building upon, and marketing the entire 11.5-acre parcel. Given an undeveloped land cost of $500,000, his profit would entail approximately $250,000 for phase one and approximately $414,000 for phase two, totalling $664,000.

The trial court also had before it various schemes for developing the 5.1 acres for retail usage, as Montgomery desired, or for developing the entire 16.6 acres for retail usage, as Columbia desired. Montgomery witness Stanley Stein, a commercial broker specializing in the construction and development of small retail centers, suggested that a thirty-thousand-square-foot shopping center could be constructed upon the 5.1-acre retail "E" frontage for $3,610,000. When fully leased, the center would have a capitalized value of $4,770,000 and yield a development profit of $1,100,000. David N. Tipton, testifying

for Columbia, disputed the viability of Stein's scheme. Tipton asserted that a one-hundred-forty-thousand-square-foot shopping center encompassing all of Columbia's 16.6 acres could be constructed for $12,250,000, would have a fully leased capitalized value of $16,820,000, and would yield a development profit of $4,570,000.

To summarize then, the court was presented with competent, credible evidence that a viable development scheme of the subject property would yield a profit in the range of $664,000 to $1,025,100. See *Seasons Coal Co.* v. *Cleveland* (1984), 10 Ohio St. 3d 77, 10 OBR 408, 461 N.E. 2d 1273; *C.E. Morris Co.* v. *Foley Constr. Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578, syllabus. Thus, it is clear that the trial court had sufficient evidence before it to justify its ruling that Montgomery's zoning ordinance did *not*, "beyond fair debate," deny Columbia an economically viable use of its land. *Ketchel* v. *Bainbridge Twp., supra*. Because the court of appeals substituted its judgment for that of the finder of fact, we must reverse the judgment of the court of appeals and reinstate the trial court's judgment on this point.

## II

Having determined that the ordinance leaves Columbia with an economically feasible utilization of its land, we turn next to our discussion of whether the zoning ordinance substantially advances Montgomery's legitimate interest in the health, safety, or welfare of the community. *Ketchel* v. *Bainbridge Twp., supra*. A court will uphold a zoning ordinance in the face of a constitutional challenge, unless the party challenging the ordinance can prove "beyond fair debate" that a city's interests in restricting the use of that land were neither legitimate nor substantially advanced by such a restriction. *Id.*

The trial court found that Montgomery had sufficiently demonstrated that the zoning ordinance in question was based on established community standards, objectives, and goals, and was rationally related to the public health, safety and welfare. The following evidence before the court supported this finding. In 1974, the Montgomery City Council adopted a statement of policy regarding planning the city's business district and its environs. Two years later, the council adopted a land use study for the Montgomery Road area prepared by the planning firm of Vogt, Sage & Pflum Consultants. In 1982, the council directed the preparation of a comprehensive community land use plan. The council published the results of a community survey of Montgomery residents the following year. In March 1983, the Montgomery Planning Commission formulated "Guidelines for the Planning and Management of the Montgomery Road Corridor." In December 1986, the city published the "City of Montgomery Comprehensive Community Plan."

The court of appeals stated that it conducted a complete review of the record and found "* * * that the ordinance setting forth the city's zoning goals and policies, enacted just prior to the filing of Columbia's complaint for declaratory judgment, does not rise to the level of a comprehensive zoning ordinance. The trial court erred in finding the existence of a comprehensive community plan." R.C. 713.06, entitled "Division of municipal corporations into zones," *permits* Ohio municipalities such as Montgomery to "* * * frame and adopt a plan for dividing the municipal corporation or any portion thereof into zones or districts, representing the recommendations of the [municipality's planning]

commission, in the interest of the public health, safety, convenience, comfort, prosperity, or general welfare * * *."

R.C. 303.02, regulating rural land use in counties, and R.C. 519.02, regulating land use in townships, *require* that zoning regulations promulgated by counties and townships be in accordance with a comprehensive plan. However, there is no statutory requirement that cities such as Montgomery enact a comprehensive community plan pursuant to its power to zone under R.C. 713.06 *et seq.* The court of appeals erred by implicitly requiring municipalities to enact a comprehensive community plan. Even assuming for the sake of argument that such a requirement existed, there was competent, credible evidence demonstrating Montgomery's extensive planning schemes. Therefore, we reverse the court of appeals' finding on this issue.

The trial court found that Montgomery's twin goals of containing commercial activity to the Montgomery Road commercial corridor and of stabilizing the delicate balance between residential and limited commercial land use were rationally related to classifying Columbia's 11.5-acre parcel as "A" residential. The court also found that Montgomery's zoning scheme was rationally related to continuing "* * * a land use trend in the City of Montgomery which provided for development of single family residences back from and adjoining the Montgomery Road retail district, with adequate buffering to separate the two uses. * * *" The court of appeals held that "* * * whether the city has a 'need' for a business is not a proper basis for a zoning decision. * * *"

While the court of appeals made a correct statement of the law, it misapplied this pronouncement to the facts of the case and to the trial court's find-ings of fact and conclusions of law. When the trial court's analysis is read as a whole, it is clear that the trial court's so-called determination regarding Montgomery's "need" for additional businesses was merely an incident of the trial court's attempt to determine the limits of Montgomery's authority to balance the community's needs for residential and commercial development.

Finally, the trial court stated that Montgomery's ordinance promoted traffic safety. The trial court noted that credible evidence had been presented to demonstrate that the addition of a forty-one-thousand-square foot shopping center, utilizing the combined 16.6-acre tract, to the Montgomery Road commercial corridor would add 4,783 new vehicles per day to the subject site, would require the addition of a new traffic signal, would in all probability increase the number of vehicle accidents in the area, and would make the Montgomery Road intersection adjacent to the proposed new shopping center entrance the busiest intersection on Montgomery Road. The court of appeals stated that traffic regulation must remain a byproduct and not the principal thrust of zoning legislation. It thus reversed the trial court's holding that Montgomery's efforts to regulate traffic safety were a part of a zoning scheme rationally related to exercising Montgomery's legitimate police powers.

This court has held several times that a "* * * city may lawfully regulate [safety hazards] pursuant to its police powers: protection of pedestrians and drivers, elimination of traffic congestion and reduction of air and noise pollution. * * *" *Brown* v. *Cleveland, supra,* at 96, 20 O.O. 3d at 90, 420 N.E. 2d at 106; *Leslie* v. *Toledo* (1981), 66 Ohio St. 2d 488, 491, 20 O.O. 3d 406, 408, 423 N.E. 2d 123, 125; see, generally, *State, ex rel. Associated*

*Land & Investment Corp.*, v. *Lynd-hurst* (1958), 168 Ohio St. 289, 7 O.O. 2d 1, 154 N.E. 2d 435; Annotation (1960), 74 A.L.R. 2d 418. While traffic safety considerations may not always be sufficient, in and of themselves, to justify a particular zoning restriction, it is apparent that the trial court merely considered promoting traffic safety as one part of its comprehensive analysis of Montgomery's intricate zoning scheme. Therefore, we reverse the judgment of the court of appeals on this issue and hold that the trial court properly found that Montgomery's zoning ordinance, as applied, substantially advances Montgomery's legitimate interest in the health, safety, and welfare of the community. The decision of the trial court is reinstated in its entirety.

*Judgment reversed.*

MOYER, C.J., HOLMES, WRIGHT and RESNICK, JJ., concur.

H. BROWN, J., concurs separately.

SWEENEY, J., dissents.

DOUGLAS, J., not participating.

H. BROWN, J., concurring. I write separately because I disagree with some of the majority's reasoning, though not its conclusion, on the issue of whether Montgomery's zoning ordinance follows a comprehensive community land use plan.

While the statutory language which governs municipal zoning (R.C. 713.06) is slightly different from that governing zoning regulation by counties and townships (R.C. 303.02 and 519.02, respectively), I think the majority makes too much of the difference. It is clear from a reading of R.C. Chapter 713 as a whole that the General Assembly intended municipalities, like townships and counties, to zone in accordance with a comprehensive plan.

In order to satisfy this requirement, however, a municipality need not contract for a formal land-use study by professional urban planners, as some of the *amici* have suggested. There need not even be a separate document, labelled "plan," which is used as a guide to drafting the ordinance. *Central Motors Corp.* v. *Pepper Pike* (1979), 63 Ohio App. 2d 34, 65, 13 O.O. 3d 347, 367, 409 N.E. 2d 258, 280; see, also, *Bell* v. *Elkhorn* (1985), 122 Wis. 2d 558, 566-567, 364 N.W. 2d 144, 148. The municipality need only show that its zoning ordinance implements a coherent land use policy derived from a rational consideration of the needs of the community as a whole. See, generally, Mandelker, Land Use Law (2 Ed. 1988) 82-84, Sections 3.14-3.15. As many courts (including our own) have recognized, a well-drafted zoning ordinance can, by itself, constitute the "comprehensive plan." *Garcia* v. *Siffrin Residential Assn.* (1980), 63 Ohio St. 2d 259, 273-274, 17 O.O. 3d 167, 175-176, 407 N.E. 2d 1369, 1379; *Central Motors, supra; Rumpke Waste, Inc.* v. *Henderson* (S.D. Ohio 1984), 591 F. Supp. 521; *Furtney* v. *Simsbury Zoning Comm.* (1970), 159 Conn. 585, 271 A. 2d 319; *Dawson Enterprises, Inc.* v. *Blaine Cty.* (1977), 98 Idaho 506, 567 P. 2d 1257; *Cleaver* v. *Bd. of Adjustment of Tredyffrin Twp.* (1964), 414 Pa. 367, 200 A. 2d 408; Mandelker, *supra,* at 82, Section 3.14.

As the majority correctly notes, there is sufficient competent, credible evidence in the record to support a finding that Montgomery has enacted zoning legislation in accordance with a comprehensive plan, and the court below erred in holding otherwise.