[Cite as *State ex rel. Phillips Supply Co. v. Cincinnati*, 2012-Ohio-6096.]

# IN THE COURT OF APPEALS

## FIRST APPELLATE DISTRICT OF OHIO

## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE EX REL. PHILLIPS SUPPLY CO., | : | APPEAL NO. C-120168<br>TRIAL NO. A-1104905 |
| STATE EX REL. ROY TAILORS UNIFORM CO., INC, | : | |
| STATE EX REL. U.S. BANK, N.A., TRUSTEE OF THE CHARLES PHILLIPS IRREVOCABLE TRUST u/a/d 6/1/1961, | : | *O P I N I O N.* |
| STATE EX REL. DALTON STREET PROPERTIES, LTD., | : | |
| PHILLIPS SUPPLY COMPANY, | : | |
| ROY TAILORS UNIFORM CO., INC., | : | |
| U.S. BANK, N.A., TRUSTEE OF THE CHARLES PHILLIPS IRREVOCABLE TRUST u/a/d 6/1/1961, | : | |
| and | : | |
| DALTON STREET PROPERTIES, LTD. | : | |
| Plaintiffs-Relators-Appellants | : | |
| vs. | : | |
| CITY OF CINCINNATI, | : | |
| AMIT B. GHOSH, P.E., | : | |
| CITY GOSPEL MISSION, | : | |
| FOUNDATION OF COMPASSIONATE AMERICAN SAMARITANS, d.b.a. LORD'S GYM, | : | |

FOUNDATION OF COMPASSIONATE   :
AMERICAN SAMARITANS d.b.a.
LORD'S PANTRY,                    :

JOBS PLUS EMPLOYMENT     :
NETWORK, INC.,

      and                 :

032811 HOLDINGS, LLC.,    :

      Defendants-Respondents-  :
      Appellees.
                       :

**Civil Appeal From:** Hamilton County Common Pleas Court

**Judgment Appealed From Is:** Affirmed

**Date of Judgment Entry on Appeal:** December 26, 2012

*Buechner Haffer Meyers and Koenig Co., LPA*, and *Peter E. Koenig*, for Plaintiffs-Relators-Appellants,

*John P. Curp*, City Solicitor*, Terrance A. Nestor*, Chief Counsel*,* and *Sean S. Suder*, Assistant City Solicitor, for Defendants-Respondents-Appellees, City of Cincinnati and Amit B. Ghosh, P.E.,

*Manley Burke L.P.A.* and *Timothy M. Burke*, for Defendants-Respondents-Appellees City Gospel Mission, Foundation of Compassionate American Samaritans d.b.a. Lord's Gym and Lord's Pantry, Jobs Plus Employment Network, Inc., and 038211 Holdings, LLC.,

*Taft Stettinius & Hollister, LLP*, *W. Stuart Dornette* and *Emily C. McNicholas*, for Amici Curiae, Strategies to End Homelessness, Greater Cincinnati Coalition for the Homeless, Lighthouse Youth Services, Cincinnati Union Bethel, Society of St. Vincent De Paul, Christ Emmanuel Christian Fellowship, Crossroads Church, Metropolitan Area Religious Coalition of Cincinnati, YWCA of Greater Cincinnati and Talbert House,

*Barrett and Weber LPA* and *C. Francis Barrett*, for Amicus Curiae Columbia Development Corporation.

**J. HOWARD SUNDERMANN, Presiding Judge.**

{¶1}   This case concerns the proposed relocation of a homeless shelter operated by defendant-respondent-appellee City Gospel Mission to an area of Cincinnati commonly referred to as Queensgate.  Plaintiffs-relators-appellants Phillips Supply Company, Roy Tailors Uniform Company, Inc., U.S. Bank, and Dalton Street Properties, Ltd., are neighboring Queensgate businesses and property owners ("Queensgate Businesses") who are opposed to the shelter's relocation.  They filed suit against defendants-respondents-appellees the City of Cincinnati, Amit E. Ghosh, the chief building official of the City of Cincinnati, ("the City") social service agencies City Gospel Mission, Foundation of Compassionate American Samaritans "FOCAS," Jobs Plus Employment Network, Inc., and 032811 Holdings, LLC, the owner of the property ("private party appellees"), challenging City Council's decision to pass a "notwithstanding ordinance" to allow City Gospel Mission to operate a homeless shelter at the property.

{¶2}   In this appeal, they challenge the trial court's judgment upholding the constitutionality of the notwithstanding ordinance.  Because the Queensgate Businesses lack standing to pursue their taxpayer claim for injunctive relief, we dismiss that claim.  And because they have not raised any genuine issues of material fact in support of their constitutional attack upon the notwithstanding ordinance in their capacity as neighboring businesses and property owners, we affirm the trial court's decision granting summary judgment to the City and the private party appellees on their declaratory judgment claim.

### I. Relocation of the City Gospel Mission Shelter

{¶3}   City Gospel Mission is planning to relocate its existing Over-the-Rhine homeless shelter to a new facility on the property located at 1801-1805 Dalton Avenue ("the Dalton Avenue property"). The Dalton Avenue property is located in an "MG"

manufacturing zoning district in a section of the West End neighborhood commonly known as "Queensgate." The Queensgate Businesses own property and operate businesses directly adjacent to or near the Dalton Avenue property.

{¶4} The proposed facility is classified as a "special assistance shelter" in the Cincinnati Zoning Code. *See* Cincinnati Municipal Code 1401-01-S11. Special assistance shelters are not permitted by right in any zoning district in the city of Cincinnati. They are conditionally permitted in certain zones and prohibited in others, such as the "MG" manufacturing zoning district. *See* Cincinnati Municipal Code 1413-05. The "MG" manufacturing zoning district is a permissive zone which, in addition to industrial and manufacturing zoning uses, permits uses such as sexually-oriented businesses, drinking establishments, and power plants, along with residential uses such as transitional housing and loft dwelling units. *See* Cincinnati Municipal Code 1413-05.

{¶5} City Gospel Mission sought approval for a special assistance shelter using the notwithstanding ordinance procedure set forth in Cincinnati Municipal Code 111-5. According to Article VII, Section 6 of the City Charter, zoning ordinances must be reviewed by the City Planning Commission before being enacted by council. If not approved by the commission, notwithstanding ordinances can only be passed by a two-thirds vote of the city council. *See* Cincinnati Municipal Code 111-5. After review by the planning commission, before a notwithstanding ordinance can be passed by city council, a committee of council must hold a public hearing and make a recommendation on the ordinance. *See id.*

{¶6} Under Cincinnati Municipal Code 111-5, among the issues to be considered by the council committee in making a recommendation to city council on a notwithstanding ordinance are: "[w]hether the proposed application will not have an adverse effect on the character of the area or the public health, safety, and welfare; and whether the proposed application is consistent with the purposes of this code and the zoning district where the

subject property is located." Cincinnati Municipal Code 111-5. The committee can also incorporate limitations or conditions on the use of the property into its recommendation to council in order to ensure that the use of the property is consistent with the character of the area and with the public health, safety, and welfare. *Id.*

{¶7} On June 17, 2011, the City Planning Commission held a public hearing on City Gospel Mission's application for a notwithstanding ordinance. At the conclusion of the hearing, the City Planning Commission rejected the recommendation of the staff of the Department of City Planning and Buildings to deny the notwithstanding ordinance, and unanimously recommended approval of the notwithstanding ordinance. On June 21, 2011, a committee of council, the Livable Communities Commission, held a public hearing on the matter. The Livable Communities Commission, which is comprised of seven of the nine members of city council, recommended approval of the notwithstanding ordinance by the full city council.

{¶8} Both the Planning Commission and the Livable Communities Commission heard extensive testimony on the relocation of the shelter to the new site from individuals both in favor of and opposed to the relocation. The Queensgate Businesses' representatives and their counsel appeared at both hearings and presented argument that the notwithstanding ordinance would be detrimental to the public health, safety, and welfare.

{¶9} On June 22, 2011, city council passed the notwithstanding ordinance, Ordinance No. 0223-2011, by a vote of 7-2, thereby approving the operation of a special assistance shelter on the Dalton property by the City Gospel Mission. The notwithstanding ordinance contains a preamble which provides the reasons for city council's action, as well as 11 conditions that address any potential impact of the use of the property as a special assistance shelter. Section three of the ordinance further provides that "the property is permitted to be used as a special assistance shelter as limited by the Ordinance, [that] the

Property has not been rezoned and remains in a "MG" Manufacturing General zoning district and [that it] shall be treated as such for all other purposes." The notwithstanding ordinance further provides that the zoning approval to use the property as a special assistance shelter expires if the property is transferred to a party unaffiliated with the City Gospel Mission.

{¶10} Following the ordinance's passage, the Queensgate Businesses sent a taxpayer demand letter to City Solicitor John Curp, demanding that he file a taxpayer lawsuit on their behalf. When Curp declined to initiate the requested action, the Queensgate Businesses filed this lawsuit challenging the constitutionality of the notwithstanding ordinance.

## II. The Current Lawsuit

{¶11} In their first three causes of action, the Queensgate Businesses sought a declaratory judgment 1) that the notwithstanding ordinance is clearly arbitrary and unreasonable and not substantially related to the health, safety, morals, and general welfare of the city of Cincinnati; 2) that they were denied their procedural due process rights protected by the United States and Ohio Constitutions through the enactment of the notwithstanding ordinance; and 3) that the city had violated their equal protection rights by "allowing City Gospel to bypass the procedures for obtaining a zoning change, text amendment, or use variance set forth in the zoning code and charter and obtain a notwithstanding ordinance in an arbitrary and unequal manner."

{¶12} In their fourth and fifth causes of action, the Queensgate Businesses asserted claims for injunctive relief and a writ of mandamus under the taxpayer standing provisions of Ohio law. In count six of their complaint, they requested damages, and in count seven they sought a declaratory judgment that the proposed uses of the York Street property were impermissible in the MG district.

6

{¶13} The private party appellees filed a motion to dismiss on July 20, 2011. The city of Cincinnati filed a motion to dismiss on July 27, 2011. That same day, the Queensgate Businesses filed a first amended complaint, which inserted the name of a previously unknown party, and added a claim for a preliminary injunction. The private party appellees and the City filed motions to dismiss the amended complaint. The trial court granted their motions to dismiss in part, dismissing the claims in counts two, three, five, and seven of the Queensgate Businesses' amended complaint.

{¶14} Because the parties had relied on evidence outside the pleadings, the trial court converted their motions to dismiss the three remaining counts in the complaint—count one for declaratory judgment, count four for injunctive relief, and count six for damages—into motions for summary judgment. Following the parties' filing of supplemental memoranda and materials, the trial court granted summary judgment to the City and the private party appellees. The trial court held that the Queensgate Businesses had failed to point to any evidence in the record that would meet the standard for determining the constitutionality of zoning ordinances as set forth by the Ohio Supreme Court in *Goldberg Cos. Inc v. Richmond Hts. City Council*, 81 Ohio St.3d 207, 214, 690 N.E.2d 510 (1998).

### *III. Taxpayer Standing*

{¶15} On appeal, the Queensgate Businesses argue in a single assignment of error that the trial court erred in granting summary judgment in favor of the City and the private party appellees on counts one, four, and six of their amended complaint because genuine issues of material fact remain. But before we can reach the merits of their assignment of error, we must first determine whether they have standing to assert their taxpayer claim for injunctive relief in count four of their complaint. *See State ex rel. Teamsters Local Union No. 456 v. Bd. of Cty. Commrs.*, 132 Ohio St.3d 47, 2012-Ohio-1861, 969 N.E.2d 224, ¶ 10.

{¶16} The City argues that the Queensgate Businesses lack standing to bring their taxpayer claim for injunctive relief because they do not seek to enforce a public right, but merely seek to benefit themselves. Whether a party has established standing to bring an action before the court is a question of law, which the court reviews de novo. *Cuyahoga Cty. Bd. of Commrs. v. State*, 112 Ohio St.3d 59, 2006-Ohio-6499, 858 N.E.2d 330, ¶ 23.

{¶17} To have standing to pursue a taxpayer claim under R.C. 733.59, a party must not only satisfy the statutory requirements prior to initiating his action—that he has made a written demand upon the city's law director and that security for the claim has been posted—but he must also demonstrate that he is enforcing "a right of action on behalf of and for the benefit of the public." *See* R.C. 733.59; *Teamsters* at ¶ 11-12; *Cincinnati ex rel. Zimmer v. Cincinnati*, 176 Ohio App.3d 588, 2008-Ohio-3156, 892 N.E.2d 987, ¶ 11; *State ex rel. Citizens for a Better Portsmouth v. Sydnor,* 61 Ohio St.3d 49, 54, 572 N.E.2d 649 (1991).

{¶18} In determining that the Queensgate Businesses had taxpayer standing, the trial court held that the Queensgate Businesses had alleged a "public interest" in preserving the industrial nature of the Queensgate area, as manifested in several city planning documents, including the "Liberty Dalton Urban Design Plan" and the "Go Cincinnati Plan," and that this "public interest" was as "significant as the public interest" presented by the employees in *State ex rel. Fisher v. City of Cleveland*, 109 Ohio St.3d 33, 2006-Ohio-1827, 845 N.E.2d 500. The trial court reasoned that the adherence to comprehensive zoning and urban development plans could be said to benefit the public as a whole, and that there was "at least arguably a public right at stake in the preservation of pre-existing zoning of the Queensgate area consistent with City urban design plans."

{¶19} In *State ex rel. Teamsters Local Union No. 456 v. Bd. of County Commissioners*, *supra*, the Ohio Supreme Court recently addressed its decision in the *Fisher* case. In *Teamsters*, a public sector union filed a taxpayer suit against Cuyahoga

County to invalidate a county resolution that excused their members from participating in an employee retirement incentive plan. *Id.* at ¶ 6. The *Teamsters* court reviewed its prior decisions in *State ex rel Caspar v. Dayton*, 53 Ohio St.3d 16, 20, 558 N.E.2d 49 (1990) and in *Fisher*. *Id.* at ¶ 13-16. In determining whether the complainants in *Teamsters* had taxpayer standing in light of *Caspar* and *Fisher*, the court distinguished the challenge brought in *Teamsters* from the taxpayer action in *Fisher*. *Id.* at ¶ 15. The court held that *Fisher* had involved an unnecessary violation of privacy by the city of Cleveland and a resulting abuse of its corporate powers. *Id.* The Supreme Court held that the taxpayer complainants in *Teamsters* had failed to allege any "concrete taxpayer interest," but instead had alleged that the "existence of a statutorily noncompliant county resolution had constitute[d] an injury in and of itself." *Id.* at ¶ 16.

{¶20} The *Teamsters* court held that while "taxpayers 'may judicially contest the validity of any official act which directly affects prejudicially their rights as taxpayers by increasing the burden of taxes or otherwise,' taxpayers cannot contest official acts 'merely upon the ground that they are unauthorized or invalid.' " *Id.* quoting *Pierce v. Hagans,* 79 Ohio St. 9, 22, 86 N.E. 519 (1908). The *Teamsters* court clarified that the taxpayer's objective must be the enforcement of a "public right." *Id.* at ¶ 17. The *Teamsters* court acknowledged that if it were to permit taxpayer standing "merely upon a showing of a city's failure to comply with a statute, such standing would not benefit the public, because it would allow constant judicial intervention into government affairs for matters that do not involve a clear public right and do not benefit the public." *Id.* The *Teamsters* court held that because "there [wa]s no vindication of public rights or conferral of public benefits to be found in the union's attempt to obtain retirement benefits for a small number of employees," they lacked taxpayer standing. *Id.*

{¶21} Here, the Queensgate Businesses argue that the notwithstanding ordinance will negatively affect their individual property values. But we agree with the City that this is quintisentially a private motive. *See State ex rel. Karwowski v. Granger Twp. Trustees*, 9th Dist. No. 08CA0017-M, 2008-Ohio-4946, ¶ 28-31 (holding that a property owner lacked taxpayer standing under R.C. 733.59 because his interest in making changes to a zoning ordinance affected only his property and did not benefit the public at large). The trial court held that their objective in challenging the ordinance was to protect the character of the Queensgate area, and that such a motive would benefit the public as a whole. But we must disagree. Queensgate is but one neighborhood among Cincinnati's fifty-two neighborhoods. Any alleged benefits from their action will affect relatively few individuals in relation to the city as a whole. Moreover, no public rights have the potential of being affected by their action in invalidating the ordinance. As the Ohio Supreme Court affirmed in *Teamsters*, a challenge to benefit a few will not operate to confer taxpayer standing. *Teamsters*, 135 Ohio St.3d 47, 2012-Ohio-1861, 969 N.E.2d 224, at ¶ 14.

{¶22} And while we agree that there may be some public benefit when a private litigant prevails against the government, ancillary public benefits are not enough to confer taxpayer standing. *See Home Builders Assn. of Dayton v. Lebanon*, 167 Ohio App.3d 247, 2006-Ohio-595, 854 N.E.2d 1097, ¶ 54 (12th Dist.). Because the Queensgate Businesses have not alleged that a clear public right is at stake, they are not entitled to taxpayer standing.

{¶23} Our conclusion that the Queensgate Businesses lack taxpayer standing to pursue the injunctive relief in count four of their complaint does not dispose of their appeal. They have also sought declaratory relief in count one in their individual capacities, which provides them standing that is separate from their standing as taxpayers. *See Teamsters* at ¶ 18; *see also Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.2d 977 ¶

33 ("when a municipality rezones a property, the owner of the adjacent property has standing to challenge the constitutionality of the zoning decision"). We, therefore, turn to the merits of the arguments raised in conjunction with their declaratory-judgment claim.

### IV. The Constitutionality of the Zoning Ordinance

{¶24} The Queensgate Businesses argue that the constitutionality of the notwithstanding ordinance cannot be decided as a matter of law because genuine issues of material fact remain as to whether the notwithstanding ordinance (1) is clearly arbitrary and unreasonable and not substantially related to the health, safety, morals, and general welfare of the city of Cincinnati, (2) illegally spot zones the Dalton Property; (3) violates the Ohio Constitution, Article XVII, Section 3; and whether (4) it violates the charter of the city of Cincinnati because City Council usurped the authority of the City of Cincinnati Planning Commission in passing the notwithstanding ordinance.

### V. Summary Judgment Standard

{¶25} We review the trial court's entry of summary judgment de novo, using the same standard that the trial court applied. *Koos v. Cent. Ohio Cellular, Inc.*, 94 Ohio App.3d 579, 588, 641 N.E.2d 265 (8th Dist.1994). Summary judgment is appropriate under Civ.R. 56(C) when "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Parsons v. Fleming,* 68 Ohio St.3d 509, 511, 628 N.E.2d 1377 (1994). The material issues in each case are identified by the substantive law and " '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Turner v. Turner*, 67 Ohio St.3d 337, 339, 617 N.E.2d 1123 (1993), quoting

11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Mayo v. Kenwood Country Club, Inc.,* 134 Ohio App.3d 336, 340, 731 N.E.2d 190 (1st Dist.1999).

### A. The Ordinance is Not Arbitrary or Unreasonable and Is Substantially Related to the Health, Safety, and General Welfare of the City of Cincinnati

{¶26}  In their first issue presented for review, the Queensgate Businesses argue that the constitutionality of the notwithstanding ordinance cannot be decided as a matter of law because there are genuine issues of material fact as to whether the notwithstanding ordinance is clearly arbitrary and unreasonable and not substantially related to the health, safety, and general welfare of the city of Cincinnati.

{¶27}  Municipalities have a great deal of power to enact zoning regulations.  "The power of a municipality to  * * *  determine land use policy is a legislative function which will not be interfered with by the courts, unless such power is exercised in an arbitrary, confiscatory, or unreasonable manner as to be in violation of constitutional guarantees." *Jaylin Invs., Inc. v. Moreland Hills*, 107 Ohio St.3d 339, 2006-Ohio-4, 839 N.E.2d 903, ¶ 21 quoting *Willott v. Beachwood*, 175 Ohio St. 557, 197 N.E.2d 901 (1964), paragraph three of the syllabus.  "A zoning regulation is presumed to be constitutional unless determined by a court to be clearly arbitrary and unreasonable and without substantial relation to the public health, safety, morals, or general welfare of the community."  *Goldberg Cos. Inc,* 81 Ohio St.3d at 214, 690 N.E.2d 510.

{¶28}  The Ohio Supreme Court has held that "[t]he legislative, not the judicial, authority is charged with the duty of determining the wisdom of zoning regulations and the judicial judgment is not to be substituted for the legislative judgment in any case in which the issue or matter is fairly debatable." *Willott*, 175 Ohio St. at 560, 197 N.E.2d 201.  Thus, the burden of proof remains with the party challenging an ordinance's constitutionality and

the standard of proof remains "beyond fair debate." *Jaylin Invs. Inc*, 107 Ohio St.3d 339, 2006-Ohio-4, 839 N.E.2d 903, ¶ 13 quoting *Goldberg Cos. Inc.*, 81 Ohio St.3d at 214, 690 N.E.2d 510. The "beyond fair debate" standard is analogous to the "beyond a reasonable doubt" standard in a criminal case. *Cent. Motors Corp. v. Pepper Pike*, 73 Ohio St.3d 581, 584, 653 N.E.2d 639 (1995); *see also State ex rel. Ridge Club v. Amberley Village*, 1st Dist. No. C-070012, 2007-Ohio-6089, ¶ 10.

{¶29} Here, the notwithstanding ordinance's preamble embodies City Council's rationale for its decision to permit the homeless shelter on the Dalton property. The preamble states in relevant part:

\* \* \*

> \* \* \* the relocation of the City Gospel Mission from its existing location in the Over-the-Rhine neighborhood to the West End neighborhood advances the City's goal of de-concentrating social service agencies so that the land use of any one neighborhood is not over-saturated with social service agencies; and
>
> \* \* \* too many social service agencies concentrated in any one neighborhood can crowd out other land uses such as residential and retail uses in that neighborhood; and
>
> \* \* \* relocating the City Gospel Mission from Over-the-Rhine helps promote the economic stability of existing land uses within the Over-the-Rhine neighborhood and promotes the preservation of the character and quality of the residential neighborhoods that make up Over-the-Rhine; and
>
> \* \* \* the relocation of the City Gospel Mission to the West End neighborhood is in keeping with the Go Cincinnati and Revive 75

13

plans, is in the best interest of the City of Cincinnati, and is in the furtherance of the public health, safety, and welfare; and

\* \* \*

\* \* \* the Cincinnati Museum Center, a West End resident and institution, has engaged City Gospel Mission to address its concerns about the potential effects of the use of the Property for a special assistance shelter, and the parties have reached a good neighbor agreement that adequately addresses the concerns of the Cincinnati Museum Center and reduces the likelihood of impacts of such use on the surrounding West End neighborhood; and

\* \* \* pursuing a use variance is not feasible because the prohibition of the use of the Property for a special assistance shelter would not deprive the property owner of all economically viable use of the Property, and as such, there is no viable administrative process available to permit a special assistance shelter on the Property; and

\* \* \* a rezoning of the Property to a zone which conditionally permits a special assistance shelter is not desired by the applicant, and a notwithstanding ordinance, unlike a zoning, will not alter the zone map \* \* \*.

{¶30} The City and private party appellees argue that the city's interest in deconcentrating social service agencies, promoting economic stability, and preserving neighborhoods is rationally related to the health, safety, and welfare of its citizens and that granting legislative relief to City Gospel Mission to use the Dalton property for a special assistance shelter is a reasonable and deliberate means to achieve these interests. They contend that to invalidate the ordinance, the Queensgate Businesses would have to

14

demonstrate with near certainty that the ordinance is completely irrational and unreasonable and that reasonable minds could only conclude that the ordinance is outside the city's constitutionally derived powers. Thus, they argue that the Queensgate Businesses must demonstrate that there are factual issues that legally affect the outcome of their claims.

{¶31} The Queensgate Businesses argue, on the other hand, that summary judgment is precluded based on three affidavits presented by professionals: Jordan Weisman, Psy.D., Menelaos Triantafillou, and Colleen McTeague, Ph.D. Ms. Weisman, a Philadephia clinical psychologist, opines that the location of the City Gospel Mission will not result in a deconcentration of social service agencies in Cincinnati, is not compliant with the suitability criteria in the Homeless to Homes Plan—Cincinnati's adopted comprehensive plan for the homeless—and is "contrary to the best interests of Cincinnati's homeless population." As a result, she concludes that the notwithstanding ordinance is "clearly arbitrary and unreasonable, and is adverse to the health, safety, and general welfare of the citizens of the City of Cincinnati" based upon her experience in "clinical psychology and social services."

{¶32} Mr. Triantafillou, a Cincinnati-based land use planner and professor, reaches the same conclusion as Weisman—that the notwithstanding ordinance is "clearly arbitrary and unreasonable." He opines that the relocation of the City Gospel Mission will not result in the deconcentration of social services; it is inconsistent with the suitability requirement of the Homeless to Homes Plan; it is inconsistent with the existing land use patterns; and it is not in the best interest of Cincinnati's homeless population. Ms. McTeague, a Cincinnati based geographer and professor, also opines that the notwithstanding ordinance is unconstitutional for substantially similar reasons as those set forth in the affidavits of Ms. Weisman and Mr. Triantafillou.

{¶33} But the difficulty with the Queensgate Businesses' argument is that even if all these statements were credible and believable, they are nothing more than opinions about whether the ordinance is a good idea. *See Downing v. Cook*, 69 Ohio St.2d 149, 151, 431 NE.2d 995 (1982) (holding that "evidence, largely consisting of opinions, is conclusory in nature or irrelevant, and does not rebut the presumption that an ordinance is [constitutional]"). They show that the wisdom of relocating the City Gospel Mission to Queensgate is fairly debatable. The Queensgate Businesses participated in that debate during the legislative process. The evidence presented in these three affidavits—testimony that they could have presented to the City Planning Commission or to City Council—may add to the debate, but it does not support a finding that the zoning ordinance is almost certainly unconstitutional. *See Ridge Club,* 1st Dist. No. C-070012, 2007-Ohio-6089, at ¶ 6, quoting *Cent. Motors Corp. v. Pepper Pike*, 63 Ohio App.2d 34, 409 N.E.2d 258, *rev'd on other grounds Cent. Motors Corp. v. Pepper Pike*, 73 Ohio St.3d 581, 653 N.E.2d 639 (1995). Thus, we conclude that the expert opinions in the three affidavits are insufficient to overcome the significant presumption of constitutionality afforded to the notwithstanding ordinance, and the ample evidence in the record that City Council's act of adopting the notwithstanding ordinance was not arbitrary and unreasonable and was substantially related to the health, safety, morals, and general welfare of the city of Cincinnati.

{¶34} The Queensgate Businesses further argue that the trial court was required to "balance" the public and private interests involved, and that this balancing requires a factual inquiry that cannot be resolved on summary judgment. They argue that any individual claiming to be aggrieved by a permitted use on an adjoining property is entitled to a trial that weighs the relative benefits of this designation against the potential burdens to the neighboring property owner. But the Queensgate Businesses have no legally recognized

16

interest in the Dalton property. Under the guise of balancing interests, they seek to reargue whether the Dalton property is the best location for City Gospel Mission's operations.

{¶35} In support of their argument, they cite several cases involving claims by property owners that zoning had unreasonably limited the use of their own land. They rely on language in *Jaylin Invs., Inc.*, 107 Ohio St.3d 339, 2006-Ohio-4, 839 N.E.2d 903 at ¶ 14 which states that "[i]n a constitutional analysis, courts must strive to balance the benefits to the public against the disadvantages to the private interests of the *landowner.*" (Emphasis added.) The Queensgate Businesses use this language to argue that their own interests as neighbors must be considered. But that is not what *Jaylin* held.

{¶36} In *Jaylin*, a property owner planned to build a 29-home subdivision on one-half acre lots in the Village of Moreland Hills, Ohio, but the village's zoning ordinance contained a two-acre minimum lot size requirement. *Id.* at ¶ 4. The purpose for the minimum lot size was to address the village's environmental concerns related to overly dense development. *Id.* The property owner brought an "as applied" constitutional challenge to the minimum lot size requirement, arguing that it would not allow him to profitably develop the properties and that the environmental concerns could be addressed in other ways. *Id.* at ¶ 15. The Ohio Supreme Court, however, held that these issues were not enough to establish that the two-acre lot limitation was unconstitutional. *Id.* at ¶ 26.

{¶37} In its analysis, the Supreme Court held that "the zoning is the focal point of the analysis, not the property owner's proposed use, and the analysis begins with a presumption that the ordinance is constitutional." *Id.* at ¶ 18. The *Jaylin* court held that the proper focus was not whether the "proposed use meets the government's legitimate goals underlying the zoning * * *," but whether [the] zoning ordinance [at issue] advances a legitimate government interest." *Id.* at ¶ 23. Thus, in *Jaylin*, the Supreme Court, when confronted with a property owner's request for a less restrictive use, considered the property

owner's interest in putting the property to a profitable use as well as the municipality's interest in restricting the use of the property to achieve legitimate governmental interests. *Id.* But even then the Supreme Court did not find the zoning ordinance unconstitutional simply because it denied the property owner the most profitable use of its land*. See id.* at ¶ 22; *see also C. Miller Chevrolet v. Willoughby Hills*, 38 Ohio St.2d 298, 304, 313 N.E.2d 400 (1974).

{¶38} Similarly, our review of *Clarke v. Warren Cty. Bd. of Commrs.*, 150 Ohio App.3d 14, 21, 2002-Ohio-6006, 778 N.E.2d 1116, ¶ 19 (12th Dist.) and *Ridge Club,* 1st Dist. No. C-070012, 2007-Ohio-6089, ¶ 34-37, which are also cited by the Queensgate Businesses, supports this analysis. In both *Clarke* and *Ridge Club*, the trial court had found that zoning of the landowner's property had denied the property owner all economically feasible uses of the property. In *Ridge Club*, this court stated the specific reason for considering the property owner's interest: by "considering only the needs of [the municipality] * * * a purely governmental use would always pass such a test, but would be wholly inappropriate when imposed on a private landowner." *Id.* at ¶ 32.

{¶39} Thus, *Jaylin*, *Clarke*, and *Ridge Club* are distinguishable because they involved a clash between the municipality and the property owner as to the best use of his or her property. They stand for the proposition that zoning which denies property owners all economically feasible uses of their property may be arbitrary and unreasonable. Here, however, the City and Holdings, LLC, the property owner, have agreed to expand the uses available on the Dalton property. The Queensgate Businesses, as neighboring businesses and property owners, have never identified any real interests in the Dalton property or how the permitted use on the Dalton Property would interfere with their ability to use their own properties. Rather, they seek to portray speculative scenarios such as the possibility of homeless people sleeping on their property as "interests" that need to be balanced by the

trial court. But by asserting these interests, they are simply trying to argue yet again that the allowance of the special assistance shelter on the Dalton property was not a good idea. This is not the standard for reviewing the constitutionality of a zoning ordinance.

{¶40} The Ohio Supreme Court has held that the wisdom of zoning ordinances is left to the legislative authority to determine. *See Willott*, 175 Ohio St. at 560, 197 N.E.2d 201. Because the review that is called for by the Queensgate Businesses would remove the presumption of constitutionality that is afforded to zoning ordinances, we cannot agree that the trial court was required to balance the Queensgate Businesses fears as "interests" in a lengthy trial. Given that the Queensgate Businesses have pointed to no facts that, if true, would establish that the ordinance is clearly arbitrary and unreasonable and not substantially related to the health, safety, morals, and general welfare of the city of Cincinnati, the City and private party appellees are entitled to summary judgment on this issue.

### B. The Ordinance Does Not Spot Zone the Property

{¶41} The Queensgate Businesses next argue that the notwithstanding ordinance constitutes spot zoning of the property. The ordinance permits City Gospel Mission to operate a special assistance shelter on the Dalton Street property. It expressly provides that it does not operate to rezone the property. Rather, it approves a use similar to transitional housing, a use which is already permitted in the MG district. *See* Cincinnati Municipal Code 1413-05. Thus, the ordinance, like a use variance, permits the operation of the special assistance shelter.

{¶42} But even if the ordinance is arguably similar enough to a rezoning to potentially support a claim of spot zoning, spot zoning has not occurred here.

'Spot zoning' is another confusing term. Many people think that a rezoning of

a single parcel of land constitutes spot zoning and is unconstitutional. This is

incorrect. Spot zoning is simply a phrase used to conclude that a rezoning is unconstitutional for specified reasons. Rezoning a single parcel or a small area is not unconstitutional per se; rezoning a small area in a discriminatory or unreasonable manner is.

Meck and Pearlman, *Ohio Planning and Zoning Law*, Section 8:41 (2011 Ed.).

{¶43} *Willott v. Beachwood*, 175 Ohio St. 557, 559, 197 N.E.2d 201 (1964), the leading case on the issue of spot zoning, provides that "spot zoning refers to the singling out of a lot or small area for discriminatory or different treatment from that accorded surrounding land which is similar in character." *Willott* involved an attempt to put a commercial use in a restrictive residential district. *Id.* The specific facts in *Willott* centered on the amendment of a zoning ordinance to allow a shopping center in an area of "highly restricted, single family, private residence zoning." *Id.* The Supreme Court held that the rezoning did not constitute spot zoning and further emphasized the difficult burden in overcoming the presumption of constitutionality afforded to zoning ordinances, stating:

> The legislative, not the judicial authority is charged with the duty of determining the wisdom of zoning regulations, and the judicial judgment is not to be substituted for the legislative judgment in any case in which the issue or matter is fairly debatable. Even though the court, on the facts presented, might decide otherwise than did council, so long as the matter is reasonably debatable, the court has no authority to interfere.

*Id.* at 560.

{¶44} The Queensgate Businesses have cited a number of cases that discuss spot zoning, but only one Ohio court has actually found that a township's zoning decision constituted spot zoning. *Renner v. Markarius*, 2d Dist No. CA 5993, 1979 Ohio App.

LEXIS 9363, *3 (August 3, 1979), involved the rezoning of a single property to support an office use. In *Renner*, a township took steps to adopt a zoning ordinance. The township's zoning advisor decided that the township needed more commercial uses and decided to designate a single property as an office use in an area that was surrounded by residential zoning and in a neighborhood of expensive single-family homes. *Id.* at *10. That single property had been used continuously as a residence for over 60 years, although it did also have a storage building for a well-drilling company. *Id.* at *6-7

{¶45} The decision to alter the property's zoning was apparently made based on traffic flow in the area. *Id.* at *10. The reasoning of the court in finding spot zoning is not very clear, but seems to rely on the increased traffic and increased potential negative impacts on housing values that a commercial use would bring to the residential district, and the seemingly arbitrary decision by the zoning advisor to change zoning on long-time residential property in a residential neighborhood. *Id.* at *12-14.

{¶46} *Willot* and *Renner* demonstrate the typical spot-zoning fact pattern, which involves conflict resulting from an attempt to put a more intense commercial use in a restrictive residential zone. The concept of spot zoning does not work well in this case, where the MG zoning district allows a broad mix of commercial, manufacturing, recreational, and residential uses. The lack of spot zoning cases involving mixed districts points to a key aspect of spot zoning that has never been defined—how differently the zoning of a property must be from a surrounding property before it constitutes spot zoning. If taken to its logical extreme, the concept of spot zoning would hold that all zoning variances are unconstitutional. Here, the notwithstanding ordinance did not rezone the Dalton property but allowed a special assistance shelter that can only be operated by City Gospel Mission under a number of restrictions; it is in effect a legislative variance.

{¶47} The Queensgate Businesses also argue that because the zoning is not in accordance with a comprehensive zoning plan, it constitutes spot zoning. They rely upon this court's decision in *Monsanto Co. v. Bd. of Elections of Hamilton Cty.*, 1st Dist. Nos. C-950735 and C-950748, 1996 Ohio App LEXIS 4433 (Oct. 9, 1996). But *Monsanto* is distinguishable because it involved a township. Townships lack home rule authority and are required under R.C. 519.02 to adopt zoning regulations in accordance with a comprehensive plan. *See, e.g., B.J. Alan Co. v. Congress Twp. Bd. of Zoning Appeals*, 124 Ohio St.3d 1, 2009-Ohio-5863, 918 N.E.2d 501, ¶ 1 (addressing the "comprehensive plan" requirement of R.C. 519.02). There is no similar requirement for municipalities. *See Cent. Motors Corp*, 73 Ohio St.3d at 586, 653 N.E.2d 639 (upholding a city's rezoning of property when the city lacked a comprehensive plan); *see also Columbia Oldsmobile v. Montgomery*, 56 Ohio St.3d 60, 66, 564 N.E.2d 455 (1990) ("there is no statutory requirement that cities * * * enact a comprehensive community plan pursuant to its power to zone under R.C. 713.06 et seq."). But even if there were such a requirement, the City's allowance of a special assistance shelter on the Dalton property was consistent with the Homeless to Homes Plan— Cincinnati's adopted comprehensive plan for the homeless.

{¶48} In October 2008, City Cincinnati Council passed an emergency ordinance which mandated that Continuum of Care "address the inadequacies of the current provision of services for single homeless individuals in the City of Cincinnati, and to put in place a comprehensive plan to implement such services." Cincinnati Ordinance 347-2008, ¶ 1. This process resulted in the development of the Homeless to Homes Plan. Among the major issues identified by this plan were the need for more appropriate shelter facilities, particularly for homeless men, and the need to provide more comprehensive care at the shelter facilities. It was determined that City Gospel's Elm Street site did not allow it to meet the goals set forth in the Homeless to Homes Plan, and that another site must be

developed. In May 2009, Cincinnati City Council passed another ordinance incorporating the Homeless to Homes plan into the Consolidated Plan of the City, and empowering the Continuum of Care to respond to this mandate by implementing the goals of the Homeless to Homes Plan. Cincinnati Ordinance 129-2009, Sections 3 and 4. This implementation process included identifying suitable sites for the location of new shelters in cooperation with representatives from existing shelters.

{¶49} Because this case does not provide for the typical spot-zoning scenario, we agree with the trial court that the applicable test for determining the constitutionality of a zoning ordinance is set forth by the Ohio Supreme Court in *Goldberg*. Even if the application of a spot-zoning standard is proper in this case, the approval of a special assistance shelter on the Dalton Property does not constitute spot zoning under the Queensgate Businesses' own definition. "[S]pot zoning refers to the singling out of a lot or small area for discriminatory or different treatment from that accorded surrounding land which is similar in character." *Willott*, 175 Ohio St. at 559, 197 N.E.2d 201; *see also Most Reverend Anthony J. Pilla v. Willowick*, 11th Dist. No. 9-243, 1982 Ohio App. LEXIS 13454, *12-13 (Dec. 23, 1982). The Queensgate Businesses argue that the approval of a special assistance shelter by the notwithstanding ordinance constitutes spot zoning because it is different from all surrounding industrial uses, and it is expressly prohibited in the district.

{¶50} But the permitted surrounding uses will not be all industrial or even commercial. The Queensgate Businesses ignore the residential use that is being developed on the property adjacent to the Dalton property, the transitional housing program on the York Street property. Transitional housing is a permitted use in the MG zone, and the shelter operated on the Dalton Property will operate similarly to transitional housing. The fact that a use has been approved on a property that is not a permitted use cannot, by itself, constitute spot zoning. If this were true, then all use variances would be unconstitutional.

23

{¶51} The approval of the notwithstanding ordinance does not constitute spot zoning as defined by Ohio courts. The standard, moreover, is ill suited to the facts in this case, which involves neighboring business owners challenging the approval of a residential use next to their properties, rather than on their own property. The zoning on all properties at issue is not exclusively commercial, residential, or manufacturing. It allows a broad mix of uses including a use quite similar to the special assistance shelter at issue in this case. In fact, this residential use, transitional housing, will be the primary use of the adjacent property. Thus, this case is different in several crucial respects from the small number of cases where courts have found spot zoning. Because there are no genuine issues of material fact as to whether the notwithstanding ordinance illegally spot zones the Dalton property, the City and the private party appellees are entitled to summary judgment on this issue.

### C. The Ordinance Does Not Conflict with R.C. 713.12

{¶52} The Queensgate Businesses next argue that genuine issues of material fact remain as to whether the notwithstanding ordinance was enacted through an exercise of police power that conflicts with Ohio's general laws. They argue that Cincinnati Municipal Code 111-5, which identifies the procedures and criteria for obtaining a notwithstanding ordinance, conflicts with R.C. 713.12, and that as a result, the ordinance is unconstitutional. The City and private party appellees argue that there is no conflict between R.C. 713.12 and Cincinnati Municipal Code 111-5 because R.C. 713.14 makes R.C. 713.12 inapplicable to a charter municipality like Cincinnati. We agree with the City and private party appellees.

{¶53} The city of Cincinnati is a charter municipality which derives its powers of local self-government from Ohio Constitution, Article XVIII, Section 3. Thus, the city's power to enact legislation is conferred by the City Charter, not the Ohio Revised Code. Cincinnati Municipal Code 111-1, which governs hearings on zoning regulations expressly states that "Section 713.12 of the Ohio Revised Code is hereby declared inoperative in the

City of Cincinnati." Both the City and the private party appellees assert that this statement was made in accordance with R.C. 713.14, which provides:

> Sections 713.06 to 713.12, inclusive, of the Revised Code do not repeal, reduce, or modify any power granted by law or charter to any municipal corporation or legislative authority thereof, or impair or restrict the power of any municipal corporation under Article XVIII of the Ohio Constitution.

{¶54} The Ohio Supreme Court has cited R.C. 713.14 for the proposition that "a municipality which has adopted a comprehensive charter is governed by the terms of the charter, and statutory provisions relating to subjects covered by the charter are inapplicable." *See State ex rel. Davis Inv. Co. v. Columbus*, 175 Ohio St. 337, 341, 194 N.E.2d 859 (1963). In *Bauman v. State ex rel. Underwood*, 122 Ohio St. 269, 270, 171 N.E. 336 (1930), the Ohio Supreme Court addressed a previous state law, containing identical language to R.C. 713.14, stating:

> Zoning regulations are police or sanitary. Under the provisions of Section 3, Article XVII, of the Constitution, municipalities may adopt local police or sanitary regulations if "not in conflict with the general laws." But the provisions of the Akron charter are not in conflict with state law; for Section 4366-12, General Code [the precursor to R.C 713.14] yields unrestricted powers to municipalities in respect to zoning, if such powers are granted by the municipal charter.

{¶55} In *Kachovec v. Akron*, 9th Dist. No. 9948, 1981 Ohio App. LEXIS 13894, *4-5 (May 20, 1981), the Ninth District Court of Appeals, interpreted *Bauman* to hold that zoning procedures were not required to be specifically set forth in the city of Akron's charter, as long as the charter permitted City Council to establish those procedures. Akron's

charter granted the city zoning power and stated that all city powers "shall be exercised and enforced in the manner prescribed by this Charter, or when not prescribed herein, in such manner as shall be provided by the ordinance or resolution of the Council." *Id.* at *4. The Ninth District stated, "[W]e think it is clear that, given such a charter provision, *Bauman* permits a municipality to establish its own zoning powers by ordinance." *Id.*

{¶56} Cincinnati's charter contains virtually identical language to the language in *Kachovec.* Article I of the City's Charter grants it all powers of "local self government and home rule and all other powers possible for a city to have under the constitution of the state of Ohio." It further states that "[a]ll such powers shall be exercised in the manner prescribed by this charter, or if not prescribed herein, in such manner as shall be provided by ordinance of city council." Like the charter considered in *Kachovec*, Cincinnati's charter grants the city the authority to adopt its own zoning regulations that differ from the default regulations found in R.C. Chapter 713.

{¶57} The city has chosen to exercise this power by specifically rejecting R.C. 713.12 and its 30-day notice requirement in Cincinnati Municipal Code 111-1, which declares R.C. 713.12 inoperative in the city of Cincinnati. In its place, the city has adopted Cincinnati Municipal Code 111-5, which provides 14 days' notice for a notwithstanding ordinance. Because there is no legitimate dispute about the city's ability to establish its own zoning procedures, the City and private party appellees are entitled to summary judgment on this issue.

### D. City Council Did Not Violate the City Charter by Passing the Ordinance

{¶58} Finally, the Queensgate Businesses argue that City Council violated the City Charter by approving the notwithstanding ordinance because City Gospel Mission had only applied for 76 beds on the Dalton property, while City Council allowed an aggregate of 125 beds in the ordinance. They argue that the City Charter does not allow City Council to

26

modify a zoning ordinance after it has been reviewed by the Planning Commission. Their argument is based upon Article VII, Sections 3 and 6 of the City Charter.

{¶59} Article VII, Section 3 of the Charter provides:

The powers and duties of the commission shall be to make plans and maps of the whole or any portion of the city and of any land outside the city which, in the opinion of the commission, bears a relation to the planning of the city, and to make changes in additions to and extensions of such plans or maps when it deems advisable. Such maps and plans shall show the commission's recommendations for the location and extent of streets, alleys, ways, viaducts, bridges, subways, parkways, parks, playgrounds and other public grounds and public improvements, of public buildings and other public properties, and of public utilities whether publicly or privately owned, for water, light, sanitation, transportation, communication, power and other purposes; and for the removal, relocation, widening, extension, narrowing, vacation, abandonment or change of use of any of the foregoing public places, works, buildings, or utilities. Such maps and plans may also include the division of the city into zones for districts, in accordance with the commission's recommendations for the limitation and regulation of the height, bulk, (including percentage of lot occupancy and set-back building lines) and use of buildings and other structures and premises in such zones or districts.

{¶60} Article VII, Section 6 of the Charter states:

No amendment of the zoning ordinance of the city or of the zone map shall be made, passed or enacted by the council until and unless such

amendment shall be approved by the commission; provided that in the case of its failure to approve, the commission shall communicate its reason for failure to approve to the council, and the council, by a vote of not less than two-thirds of its members, shall have the power to overrule such failure to approve and make, adopt, or enact the proposed amendment.

{¶61} Our reading of these sections does not support the Queensgate Businesses' argument. The Planning Commission's role as set forth in the city's charter is to review zoning matters and make recommendations to City Council. The Commission acts in an advisory role on zoning matters and is not the decision maker. While its recommendation may trigger the requirement of a supermajority of City Council to reject its advice, council has the authority to act against the recommendations of the Planning Commission.

{¶62} Here, City Council passed the notwithstanding ordinance by a 7-2 vote, which exceeded the supermajority vote requirement to overrule the City Planning Commission. As a result, whether the City Planning Commission may have conditioned its decision on a particular number of beds and Council may have approved a different number of beds, does not create a genuine issue of material fact that would preclude summary judgment because this factual issue would not invalidate the ordinance. *See, e.g., Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47 ¶ 12 (noting that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). We overrule the sole assignment of error, and we affirm the judgment of the trial court.

Judgment affirmed.

HENDON and CUNNINGHAM, JJ., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.